## Court of Appeals.

### *January*, 1891.

(Reversing 8 *N. Y. Crim. Rep.* 43.)

## PEOPLE *v.* FLACK.

*Conspiracy—intent—presumptions—charge.*

The mere fact that a conspiracy has for its object the doing of an act which may be unlawful, followed by the doing of such act, does not constitute the crime of conspiracy, unless the jury find that the parties were actuated by a criminal intent. If the actual criminal or wrongful purpose does not accompany the agreement, the crime of conspiracy has not been committed.

In a criminal case, however clear the proof may be, or however incontrovertible may seem to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury.

The presumption that a person intends the ordinary consequences of his acts is, as applied to criminal cases, a rule to aid the jury in reaching a conclusion upon a question of fact, and is not a presumption of law.

On a trial on an indictment, intent is traversable, and the defendant may testify as to his intent.

While the court will not pass upon an isolated clause in the charge of a trial judge, which may seem to be erroneous, as a ground for reversing the judgment, where the charge, as a whole, states the true rule of law, and it can be seen that no injury has resulted from the alleged error, on the other hand, where the whole drift of a charge on a particular question is erroneous, error will not be cured because expressions may be found in the charge which, standing alone, would free it from the objections urged.

Appeal by defendants, James A. Flack and William L. Flack, from a judgment of the general term of the supreme

court, affirming a judgment entered upon a conviction of the crime of conspiracy rendered against them on the verdict of a jury in the court of oyer and terminer of New York city and county, on March 31, 1890.

The indictment, facts, and points of counsel are very fully given in the report of the case at general term, 8 *N. Y. Criminal Reports*, 43.

*George F. Danforth and Horace Russell*, for defendants appellants.

*John R. Fellows*, district attorney, *and John W. Goff*, assistant, for the people respondent.

ANDREWS, S.—This is an appeal by James A. Flack and William L. Flack from a conviction of the crime of conspiracy. The indictment contains sixteen counts, which may be divided into two classes. The first class charge the defendants, together with three other persons, with falsely instituting and maintaining an action for divorce in the name of Mary E. Flack, the wife of James A. Flack, against her husband, without her knowledge or consent. The second class charge the defendants with deception and imposition upon the court, and the procuring of a judgment of divorce in the said action by illegal and fraudulent practices.

The indictment is founded upon the statute which (omitting clauses not now material) makes it a misdemeanor for two or more persons to conspire "falsely to institute or maintain an action or special proceeding, or to commit any act for the perversion or obstruction of justice or of the due administration of the law" (*Penal Code*, § 168). The action of Flack *v.* Flack was commenced April 22, 1889, by the service of a summons and complaint upon the defendant therein. The complaint purported to be verified by the plaintiff, Mary E. Flack. It alleged the intermar-

riage of the parties in 1850, and charged that the defendant, since said marriage, had committed adultery with one Susan T. Reynolds, and that since the first day of October, 1888, and for several years prior thereto, he had lived in adulterous intercourse with the said Susan T. Reynolds, at 319 West Twenty-ninth street, in the city of New York. The complaint also contained the usual averments that the adultery charged was committed without the connivance, privity, or procurement of the plaintiff; that five years had not elapsed since its discovery by her, and that she had not voluntarily cohabited with the defendant thereafter. The complaint demanded judgment dissolving the marriage between the parties, with a provision therein for the reasonable support and maintenance of the plaintiff. The counts in the complaint charging a conspiracy between the defendants falsely to institute and maintain the action without the knowledge and consent of Mary E. Flack, the nominal plaintiff were sought to be supported on the trial mainly by her testimony. She testified, in substance, that she never consented to or authorized the bringing of the action, and while it is inferrible from her testimony that she suspected her husband's infidelity, she testified that she had no knowledge until after the judgment of divorce was rendered, either that such an action had been brought or that her husband had committed adultery as charged in the complaint. She admitted that she did consent that her husband` might procure a "bill of separation," but not that he should procure a divorce. She denied the signature purporting to be hers to the affidavit annexed to the complaint, and also the signature to the affidavit of regularity, taken by the referee and annexed to the judgment roll. She admitted that she signed certain papers on several occasions presented to her by her son, but testified that she supposed that they related to the separation which had been spoken of between herself and her husband and son, and that she signed them on that understanding and representation. The jury might undoubtedly have found upon the evidence that Mrs. Flack

was deceived into verifying the complaint and signing the affidavit of regularity, but there is very little room to doubt upon the whole evidence that whatever may have been the fraud practised upon her, the signatures to these papers were her genuine signatures.

The evidence of James A. Flack, taken before the grand jury, was read in evidence by the prosecution on the trial of the indictment, and the defendant William I. Flack was sworn as a witness on his own behalf. They denied any conspiracy or fraud, and testified that the suit was commenced and prosecuted with the full knowledge and acquiescence of Mrs. Flack.

The evidence given on the trial to sustain that part of the charge, that the defendants conspired to falsely *maintain* the action for divorce, did not proceed upon a denial of the fact of adultery charged in the complaint. On the contrary, it was proved on the part of the prosecution, and was conceded by the defendants, that the defendant James A. Flack had for more than fifteen years before the trial lived in adulterous intercourse with a woman whose real name was Sarah Cherry, but who had passed by the name of Susan T. Raymond, and by whom he had a son, who, at the time of the trial, was about fifteen years of age. The claim on the part of the People was that this woman was intentionally misnamed in the complaint, which falsely stated the name of the adulteress to be other than her real name, and also that they induced two witnesses who knew of the adulterous intercourse between James A. Flack and the woman Raymond, and by whose depositions taken before the referee the adultery charged in the complaint was proved, to suppress the real name, and to testify that the person with whom James A. Flack lived in adulterous intercourse was known to them as Susan T. Reynolds. It is also claimed that they were induced to swear falsely that they had known Mrs. Flack for five years. It was not denied, indeed, it was conceded, that the testimony of these witnesses was perfectly true as to the material fact of the

adultery and the adulterous intercourse at the place and during the period named in the complaint, and that the only misstatements were as to the identity of the name in the depositions with that of the real adulteress and in respect of the time the witnesses had known Mrs. Flack.

These two witnesses testified on the trial of the indictment that they had never known Mrs. Raymond to pass by the name of Reynolds, and they gave as a reason for suppressing the true name in their depositions that Mrs. Raymond, who, as agent for James A. Flack, presented the depositions to them for their signatures, on her attention being called by them to the discrepancy, said "it was all right, the name Reynolds, a covering for the boy's sake; it was done for the boy, leaving out the name Raymond, and the name Reynolds was put in instead of Raymond." The defendant James A. Flack, in his evidence before the grand jury (which was introduced by The People), testified that the woman Raymond went at times by the name of Reynolds.

The counts of the second class, viz.: those charging deception and imposture on the court, and the procuring of the judgment of divorce by illegal and fraudulent practices, were sought to be supported mainly by proof of certain acts and transactions not disclosed on the face of the judgment record in the divorce action, but proved by witnesses relating to papers embodied in the record and upon which the judgment was founded.

The judgment, although regular upon its face, was, as was claimed by the prosecution, fraudulent by reason of the circumstances disclosed by this evidence.

It appears that on or about the second day of July, 1889, Mr. Meeks, who, on the 10th of June, 1889, had been appointed by an order of Judge Bookstaver referee in the action of Flack v. Flack, applied to the same judge, upon the request of Ambrose Monell, the attorney of record of the plaintiff in the action (Monell being then ill and absent from the city of New York), for a judgment of divorce, pursuant to the prayer of the complaint in the action. The

application was made upon papers, including the original
summons and complaint, duly verified, affidavit of default,
order of reference, oath of referee, deposition of Mary E.
Flack, proofs taken by the referee and the referee's report.
The judge, after examining the papers, declined to grant
the application, for the reason that Ambrose Monell, the
attorney of record for Mary E. Flack, the plaintiff, was
known to him to be the official attorney for the defendant
James A. Flack, then sheriff of the county of New York.
There is some discrepancy in the testimony as to what
further occurred on that occasion between the judge and
Mr. Meeks.   What the latter did is substantially uncontra-
dicted.   He took the papers and went to the office of Ben-
jamin Wright, a reputable attorney, and stated to him the
case and the objection of the judge, and requested him to
appear as plaintiff's attorney in place of Monell. Wright,
after much pursuasion, finally consented to do so, on being
assured that he would be furnished with an authority from
Monell to appear for Mrs. Flack.

The papers originally presented to Judge Bookstaver
were then changed and reformed.   The original summons,
signed by Ambrose Monell, as attorney for the plaintiff,
was torn from the complaint and a new summons was
attached thereto, signed by Wright as attorney for the plain-
tiff, and which differed from the original summons in the
name of the attorney only; the signature of Monell, as
attorney, signed to the complaint, was erased, and that of
Wright was written by him over the erasure; the affidavit
of default made by Monell on the 22nd of May, 1889, was
detached from the other papers and a new affidavit of the
same tenor, purporting to have made by Wright on the
same 22nd of May, was drawn and signed, and sworn to
by Wright; a new order of reference, purporting to have
been made on the third day of June, 1889, " on the motion
of Benjamin Wright, attorney for the plaintiff," appoint-
ing Joseph Meeks referee, was drawn, and also a new form

of decree, stating that the judgment was ordered on motion of Wright, instead of Monell as in the other.

The new papers, and such of the original ones as had not been changed, were then fastened together, and subsequently were presented to Judge Bookstaver, who then granted the order for judgment, and judgment for absolute divorce was thereafter entered.

If the judge had granted judgment upon the application first made, no question could have arisen as to its regularity, except that it would have been open to the plaintiff to contest the authority to bring the action in her name. None of the questions would then have arisen which were made the subject of investigation on the present trial, growing out of the changes made in the papers. These changes, though made apparently for the sole purpose of accomplishing the substitution of Mr. Wright as attorney for the plaintiff in place of Mr. Monell, in order to meet the objection of the judge, were nevertheless wholly irregular and unauthorized, and the roll, as finally made up, did not represent the actual truth. Mr. Wright was not legally substituted as attorney in place of Monell, and was not authorized to appear for the plaintiff in the action; the affidavit of the service of the summons relates to a different summons from that annexed to the roll; the new summons had never, in fact, been served, and the affidavit that twenty days had elapsed since the service thereof was untrue; the proofs of adultery were taken under the order of reference of June 10, 1888, and not under the order of July 3, 1888; the referee's report reported acts performed by him as referee before the order of reference contained in the roll was made. This series of blunders, irregularities, or frauds, whichever they were, was committed by Meeks, one of the defendants, in connection with Wright. Both were sworn as witnesses on the trial. They differed in respect of some of the details, but both uneqivocally denied any intentional fraud upon the plaintiff in the action or upon the court, and asserted that their only purpose was to effect a substitution of

Wright in place of Monell, and that they had no idea that the rights of the parties to the action would be in any way affected or prejudiced by what was done.

We are of opinion that errors was committed by the learned trial judge, in his charge to the jury, which require a reversal of the judgment below. Before proceeding to a particular consideration of the objectionable features of the charge, a brief reference to the law of conspiracy will aid in understanding the points upon which our judgment proceeds. The gist of the crime of conspiracy consists in a corrupt agreement between two or more individuals to do an unlawful act, unlawful either as a means or as an end (*Bishop's Crim. Law*, § 171, *et esq.*, and cases cited). The agreement may be established by direct proof or by inference, as a deduction from conduct which discloses a common design on the part of the persons charged to act together for the accomplishment of the unlawful purpose. At common law the crime of conspiracy was complete when a corrupt agreement was made, although not followed by any overt act, and no step had been taken in furtherance of the oject of conspiracy. The statute of New York has modified the common law in this respect, by requiring that to constitute the crime of conspiracy there must be both an agreement and an overt act to effect the object of the agreement, except where the conspiracy is to commit certain felonies specified (*Penal Code*, § 171).

The formation of a common design by two or more persons is never *simpliciter* a criminal conspiracy. This may be, and often is, perfectly innocent. The criminal quality resides in the intention of the parties to the agreement, construed in connection with the purpose contemplated. The mere fact that the conspiracy has for its object the doing of an act which may be unlawful, followed by the doing of such act, does not constitute the crime of conspiracy, unless the jury find that the parties were actuated by a criminal intent. In many cases this inference would be irresistible; in others the jury might find that, although the

object of the agreement and the overt act were unlawful, nevertheless, the parties charged acted under a misconception or in ignorance, without any actual criminal motive. If that conclusion should be reached by the jury, then, whatever other criminal penalties the parties might have incurred, the crime of conspiracy would not have been established and the defendants would be entitled to an acquittal. The actual criminal or wrongful purpose must accompany the agreement, and if that is absent the crime of conspiracy has not been committed.

This principle of the law of conspiracy is illustrated in the case of the People v. Powell (63 *N. Y.* 88), which was the case of an indictment for a conspiracy by the defendants, Commissioners of Charities of Kings County, to purchase supplies without advertising for proposals as required by statute. The court charged that if the jury should find that the defendants entered into an agreement to purchase supplies without advertising, and did purchase them in pursuance of such agreement, the case against them was made out. This court affirmed the order of the general term, which reversed the judgment of conviction for misdirection in the charge, this court saying, " but to make an agreement between two or more persons to do an act, innocent in itself, a criminal conspiracy, it is not enough that it appears that the act which was the object of the agreement was pro. hibited. The confederation must be corrupt. The agreement must have been entered into with an evil purpose, as distinguished from a purpose simply to do the act prohibited, in ignorance of the prohibition. This is implied in the meaning of the word conspiracy." And later on it was said, "it was open to the jury to find, upon the evidence, that no criminal intention existed, and if this had been found, to have acquitted the defendants."

The conspiracy charged in the Powell case was to do an act *malum prohibitum* merely, and the reference to that fact in the opinion was to show the distinction between a direct indictment for doing an act prohibited by law, but

innocent in itself, which, as was held in People *v.* Gardener (62 *N. Y.* 299), might be supported, irrespective of motive or intent, and an indictment for conspiracy to do the same act where the criminal intention is an essential and indispensable element.  It is alike the general rule of law and the dictate of natural justice that, to constitute guilt, there must not only be a wrongful act, but a criminal intention. Under our system (unless in exceptional cases), both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovert-ible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse, the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury.   The general rule that in criminal cases the question of criminal intent must be submitted to the jury, however significant the facts may be, has frequently been declared by this court.

In McKenna *v.* People (81 *N. Y.*, 360), which was the case of indictment for murder, it was held that, however clear the circumstances might be, the question of guilty intent must be left exclusively to the jury, and in that case a conviction for manslaughter was reversed for error in the instruction to the jury, " that the jury, if they believe the evidence offered in behalf of the people to be true, would be justified in finding the prisoner guilty."  This court said that the charge may have been understood by the jury as involving the opinion of the court upon the intent, as well as the other elements of the crime, and was likely to mislead and prejudice them, but that in any view " it was stated much stronger than it ought to have been, and was calculated to make an erroneous impression upon the minds of the jurors."

In People *v.* Baker (96 *N. Y.* 340; 2 *N. Y. Crim. Rep.* 218) this court reversed a conviction of the defendant for obtaining money and property by false pretenses. The trial judge charged the jury, " If you find that the defendant made the representations charged in the indictment, and that they were false, and that the defendant knew that they were false when he made them, then the law presumes the fraudulent intent." This was held to be error, the court in its opinion by EARL, J., saying: " The crime of false pretenses is not made out by simply showing that the representations charged in the indictment were made, and that they were false, and that the defendant knew them to be false. The jury from these facts, and from all the other facts, may infer a fraudulent intent, but the law does not infer a fraudulent; that is to be found as a fact by the jury, and is not an inference of law." The presumption that a person intends the ordinary consequences of his acts is, as applied to criminal cases, a rule to aid the jury in reaching a conclusion upon a question of fact, and is not a presumption of law (Filkins *v.* People, 69 *N. Y.*, 100), and on the trial of an indictment the intent is traversable, and the defendant may testify as to his intent (Kerrains *v.* People, 60 *N. Y.* 221; People *v.* Baker, *supra*).

The learned trial judge, in his charge to the jury, after adverting to the rule that the jury were the exclusive judges of the facts, and that the responsibility for their determination devolved exclusively upon them, and after defining the law of conspiracy, proceeded as follows: " I now hold in my hands the document which has brought you here to-night, and has brought me here—the judgment roll in this action. I feel bound to say to you, gentlemen, that this judgment record is a record of a fraudulent divorce. Of this there can be no doubt whatever. It would be a misapplication of language to call it an irregular proceeding. It is unquestionably fraudulent, and the two questions for you to determine are, first, whether the suit which resulted in this decree was fraudulently and falsely insti-

tuted: if it was then the other question is immaterial, except as to one defendant. If it was not falsely or fraudulently instituted, then the other question for your consideration is, was this fraudulent decree obtained by fraudulent means; and in that I mean fraudulent means used by these defendants. Now, when I pronounce this a fraudulent decree, I do not mean to characterize the conduct of the defendants, which I meant to leave exclusively to you, but I would not be performing my duty faithfully if I told you that the preparation, for instance, of a summons, and its signature by an attorney, without any authority from the plaintiff, was a mere irregularity."

The judge then referred to the various steps taken in the preparation of the roll, the substitution of a new attorney, the erasure of the name of Monell in the original complaint, and the writing in of the name of Wright, the attaching of the affidavit of service of the original summons and complaint to the new summons prepared by Wright, and concluded this summary as follows: "In the same way I might go through the entire record. There it is. We cannot get away from it. It is a bald, naked fact that it is fraudulent, and the question is: Are these defendants responsible for it in the sense of the conspiracy act?" Later on in the charge the learned judge, recurring to the circumstances connected with the preparation of the judgment roll, said: "These were not irregularities. They were devices which must be characterized as fraudulent, and upon them the final decree was obtained." It seems impossible to treat the charge as anything less than an instruction to the jury that the acts connected with the preparation of the roll were fraudulent and that it was left to the jury simply to determine whether they were performed by the defendants, or whether, if performed by one of the defendants, the others were responsible therefor under the law of conspiracy.

The claim that the learned judge intended simply to charge that by reason of the facts disclosed the judgment

was void for want of jurisdiction, is wholly unwarranted. It attributes to the learned judge a want of precision in the use of language which has no justification. It is plain that he intended (what he did in express terms) to brand the acts referred to as fraudulent devices resorted to to obtain the decree of divorce, and that, when taking the roll in his hands, he declared to the jury that it was the record of a fraudulent divorce, he intended to characterize the acts which led to the decree, and by reason of which the judgment was procured, as fraudulent. In this we think the judge invaded the proper province of the jury. The character of the acts done, the design with which they were done, and whether fraudulent or not, were questions for the jury.

The defendant Meeks and Wright, the attorney, both denied any fraudulent intent. It could not be ruled as matter of law that what they did were fraudulent devices to procure the decree. It was for the jury to say whether these acts were blunders or frauds. The question at issue was whether the acts were done in pursuance of a fraudulent conspiracy to wrong the plaintiff in the action, or to impose upon and deceive the court into granting the judgment. Whether the procedure was authorized by law, or the practice of the court, was proper and important to be considered by the jury upon the question of criminal intent, but however irregular or unauthorized the proceedings were, the inference of intent to be drawn therefrom was one of fact, and not of law. The objection to the charge to which we have adverted was not, we think, obviated because here and there in the course of his protracted charge are to be found expressions in which the learned judge seemed to qualify the expressions referred to. It is a rule founded upon good sense and the most obvious propriety, that is construing a charge, either in a civil or criminal case, the whole charge is to be considered together, and that a judgment will not be reversed for an erroneous instruction which was corrected by the judge where it appears with reasonable

certainty that the jury were not misled.    The rule is
adopted in the interest of substantial justice.    On the one
hand, the court will not fasten upon an isolated clause in
the charge which may seem to be erroneous, as a ground
for reversing a judgment, where the charge as a whole
states the true rule of law and it can be seen that no injury
resulted from the alleged error; so, on the other hand,
where the whole drift of a charge on a particular question
is erroneous, the error will not be cured because expressions
may be found in the charge which, standing alone, would
free it from the objections urged.

The learned judge, in his main charge, made no refer-
ence to the question of criminal intent as an element of the
crime of conspiracy.    It would seem that he was of opinion
that the law presumed a criminal intent if the acts done
were unlawful.    We think valid exceptions were also taken·
to the instructions upon this subject and to rulings made
subsequent to the. main charge.    The record shows that one
of the counsel for the defendants, after the main charge had
been concluded, said to the court : " You do not mention the
presumption of innocence."    The court, after instructing
the jury upon the point to which its attention had been
called, then said : " I ought to say, not as a supplement to
the proposition, but as an independent proposition, that
ignorance on the part of the defendants, or any of them, of
the meaning of this statute (Conspiracy statute), cannot be
a shield to them if you believe they have committed the
acts.    If you believe beyond a doubt that they have com-
mitted the acts which constitute the offense, as I have defined
it to you, then they are guilty."    On exception being taken
to this instruction, the court said : " I refer to that because
you will recollect that each of these defendants, when put
upon the stand, were asked if they had conspired, if they
had perverted the law, or perverted the administration of
justice, and William L. Flack at one time said he did not
know what that meant.    Of course, gentlemen, this is of no
consequence.    The question is whether they have done the

acts which bring the case within the language of the statute, the perversion of justice or of the due administration of the law." The court, in these instructions, disregarded the fundamental rule that a criminal intention must accompany the act in order to constitute crime, and that the act, while it may be the basis for the inference of a criminal intention by the jury, and is frequently irrefragible evidence of such intent, if unaccompanied by such criminal intent, is not a crime. It is claimed that the error in the instructions mentioned was corrected by what subsequently occurred. Immediately following these instructions the following colloquy occurred between the judge and counsel: Mr. Russell: "I ask Your Honor to add to that, that although they have doné the acts, unless they did them with a criminal intent they cannot be convicted." The Court: "Of course." Mr. Russell: "The criminal intent is not necessarily to be inferred from the doing of the act." The Court: "It is for the jury to say whether any other consideration can be given to the guilty act than that." Mr. Russell: "I will except to that language." The Court: "I will charge in the language you have requested." Mr. Russell: "That although the defendants may have committed the acts alleged, they cannot be convicted of a criminal conspiracy unless they did the acts with a criminal intent." The Court: "Yes." Mr. Fellows: "The jury may find the intent from the act itself, if they so choose." The Court: "Yes; if a man commits larceny he may say he did not intend to, but if the act in dicates a guilty intent, of course that is the end of it."

Assuming that if the discussion upon the point of criminal intent had been closed at this point, it would have corrected the error in the previous charge, it was not so closed. The jury, after they had retired, returned to the court and requested of the court a definition of criminal intent. The court replied that "a criminal intent is the doing of an unlawful act, intending to do it." After further colloquy between the court and the jurors and counsel, the court, referring to what constitutes crime, said: "If he (a defend-

ant) has no moral sense, or is ignorant of the law, he is still guilty. If he does the unlawful act, and intends to do such act, and is a sane man," and to this an exception was taken. This instruction made the question of guilt to depend solely upon the intentionally doing of an unlawful act. It was a substantial reaffirmance by the judge of the doctrine of the charge that, although there was no intention on the part of the defendants to do anything wrong, if the acts done were within the Conspiracy act, and the intention was to do these acts, the defendants were guilty. For reasons hereinbefore stated this instruction was erroneous. It was given at a critical period of the trial and if by any close criticism the language of the judge might be deprived of its apparent meaning, it is impossible to say that the jury were not misled thereby.

Assuming that the jury should find that the defendant James A. Flack instituted the divorce suit without actual authority from Mrs. Flack, nevertheless, the jury had a right, in passing upon the question of criminal intent, to consider whether he supposed that her consent to a bill of separation justified a proceeding for an absolute divorce. So, also, in respect to the misnaming of the adulteress in the complaint and in the depositions prepared for the witnesses, and inducing them to swear to them, the jury might consider whether the real purpose was "a covering for the boy's sake," without any criminal design. They had a right to consider, also, whether the acts of Meeks and Wright, in making up a new judgment roll and procuring the judge to grant the decree, were fraudulent acts, or were performed, as they testified, without any fraudulent purpose, however unjustifiable or unauthorized those acts may have been.

For the reasons stated we think the defendants are entitled to a reversal of the judgment of conviction.

Judgment reversed and a new trial granted.

All concur, except EARL and GRAY, JJ., dissenting.

NOTE.—Upon the question of intent, the following cases are of interest:

Where an adulterated article, which can be used as food, or as a drug, or for other purposes, is sold, there must be, to warrant the conviction of the seller (*Laws* 1881, ch. 407), proof that the article was sold as food or as a drug according to the allegations of the complaint, and also that the article was sold with a criminal intent or under circumstances which show criminal negligence (People *v.* Fuller, 1 *N. Y. Crim. Rep.* 172).

To warrant the conviction of an inspector of election who wilfully excluded the vote of a certain voter at an election where he was legally entitled to vote, it must appear that the inspector acted wilfully, that is, with a knowledge aforethought and a wicked intent (People *v.* Boas, 1 *N. Y. Crim. Rep.* 132).

When one voluntarily or wilfully does an act which has a tendency to destroy another's life, the actual and necessary conclusion from the act is, that he intended to destroy such person's life (People *v.* Majone, 1 *N. Y. Crim. Rep.* 86).

Whether the intent to kill has been made the subject of such deliberation as to create the crime of murder in the first degree is ordinarily incapable of direct proof, but may be ascertained from the circumstances (*Id.*).

To constitute the crime of obtaining property by false pretences in addition to proving the false pretences, and that the money was paid, or the property parted with in reliance thereon or under the inducement thereof, it must also be proved that the false pretences were made with intent to cheat and defraud another (People *v.* Baker, 2 *N. Y. Crim. Rep.* 218).

Whether or not there is a fraudulent intent is to be found as a fact by the jury. It is not a presumption of law, and a charge which informs the jury that from a certain state of facts the law presumes a fraudulent intent, is erroneous (*Id.*).

Under the statute, it is the duty of the judge to leave to the jury the consideration of the question of intoxication in determining the motive and intent, and this on an indictment for murder in the first degree, whether the defendant acted with deliberation or premeditation (People *v.* Mills, 3 *N. Y. Crim. Rep.* 184).

A charge upon a trial for murder, that there should be a conviction of murder in the first degree or an acquittal, is error, as taking from the jury the right and power to determine the intent, deliberation, and premeditation (People *v.* Kelly, 3 *N. Y. Crim. Rep.* 35).

The giving of a check by a person upon a bank in which he has no deposit or credit, is not larceny under section 529 of the Penal

Code unless there is wilful intent to defraud (People *v.* Cuykendall, 3 *N. Y. Crim. Rep.* 312).

Where a specific intent is required to make the act criminal, the doing of the act does not raise a presumption that it was done with that intent (People *v.* Platt, 4 *N. Y. Crim. Rep.* 53).

Upon a trial for the abduction of a female under sixteen years of age, if the abducted female was in fact under that age at the time of the commission of the offence, it is immaterial whether or not the defendant at that time knew she was under such age (People *v.* Stott, 4 *N. Y. Crim. Rep.* 306).

The violation of the provisions of section 8, ch. 185 of the Laws of 1885 (the Oleomargarine Act) depends upon an intent to impose one article for another, both in the prohibition as to the manufacture and as to the sale of the simulated article (People *v.* Kerin, 4 *N. Y. Crim. Rep.* 140).

Proof of the corrupt intent in a prosecution for bribery is just as essential in order to convict as proof of the fact itself of giving or offering money (People *v.* Kerr, 6 *N. Y. Crim. Rep.* 406).

Where the intent of an act is an essential element thereof, evidence of the advice of counsel honestly given is competent (People *v.* Burton, 1 *N. Y. Crim. Rep.* 297; People *v.* Campbell, 18 *W. Dig.* 256.

As to the judge's charge, the following recent authorities are relevant:

Comments by the trial judge on the testimony, so long as the judge leaves all the questions of fact to the jury and instructs them that they are the sole judges of matters of fact are not the subject of legal exception (People *v.* Carpenter, 4 *N. Y. Crim. Rep.* 39; People *v.* O'Neil, 6 *Id.* 274; People *v.* Druse, 5 *Id.* 10).

Where it is undisputed that a crime has been committed, of which complainant was the victim, a statement by the trial judge in his charge that the crime was one of the most atrocious known to the law, is not error where the judge expresses no opinion on the guilt of the defendant, and leaves all the facts to the jury under proper instructions (People *v.* McInnery, 3 *N. Y. Crim. Rep.* 47).

If the charge as a whole, gives the correct rule of law upon a given question, the judgment will not be reversed, and if the language employed be capable of different constructions, that construction will be considered adopted which will lead to affirmance of the judgment unless it appears that the jury were or might have been misled (People *v.* McCallam, 5 *Id.* 143).

Under an indictment under the general statutes of South Carolina, section 2084, for the breach of a written contract to serve as a

laborer, a request to charge that "if the jury should find that the contract does not state the time when the laborer was to be paid, the contract is void, and the defendant should be acquitted," is properly refused, as it is the province of the court to construe the contract (S. C.) 10 *S. E. Rep.* 876.

As to intent, see *Abbott's Brief for the Trial of Criminal Cases*, § 783–786.

In an article, "The Decision of the Flack Case in the Court of Appeals," in the *New York Law Journal*, of January 17, 1891, the present editor ventured to criticize the case at bar upon the ground that the rulings of the trial judge characterized by the court of appeals as erroneous, in any event could have only affected the defendant Meeks, who did not appeal, and did not injure the defendants Flack.