**UNITED STATES v. O'CONNELL et al.**

**Nos. 203, 209.**

Circuit Court of Appeals, Second Circuit.

March 24, 1942.

Edward V. Broderick, of New York City, for defendants-appellants Francis M. O'Connell and James J. O'Connell.

Robert J. FitzSimmons, of New York City (Warren H. Mayell, of New York City, of counsel), for defendant-appellant Daniel J. Houlihan.

Mathias F. Correa, U. S. Atty., of New York City (Myles J. Lane, Asst. U. S. Atty., of New York City, of counsel), for plaintiff-appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendants were indicted for conspiring to evade the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq., under which defendant Francis M. O'Connell had registered for military service. He had stated in his questionnaire that he had three dependents—his widowed sister and her two children—and that he had been contributing $60 a week to her support. This statement was supported by the oath of the sister as well as himself. On the basis of this information Local Board No. 1 classified him in 1A—fit for immediate service. Thereafter his father, James J. O'Connell, filed an appeal on his behalf while Francis was absent in Florida, in which he challenged the correctness of the classification. Thereupon the Appeal Board reversed the Local Board and classified Francis in 3A because of his alleged dependents, after which his Local Board reclassified him and again placed him in 1A. He again appealed but the Appeal Board this time affirmed the 1A classification.

About May 14, 1941, because of an anonymous complaint against Francis, Arthur Henry, an investigator from the Selective Service Headquarters, was assigned to investigate the case. On May 15, 1941, Henry asked Francis to come to headquarters for an interview but the latter requested Henry to meet him outside the office. During the course of a conversation between them Francis told Henry that his sister depended upon him, that his salary was $50 a week and that he contributed $40 of it to his sister. Henry told Francis that he had seen copies of letters stating that his father, James J. O'Connell, was liable for the sister's support, but Francis replied "that is just talk." At this interview Francis mentioned the defendant Houlihan and asked Henry whether he knew him. Houlihan was chairman of one of the local draft boards.

On the evening of May 15 the father went to see Houlihan and asked him to help with his son's registration, and to talk to Henry about it. Houlihan telephoned Henry on May 16 and arranged to meet him at lunch the next day. They met at 201st Street and the Grand Concourse and Houlihan said he wished to have Henry meet the father. He said that Francis was getting kicked around by his Local Board and he wanted to see if Henry could not help. Houlihan then drove Henry in his car to 4300 Martha Avenue where James O'Connell was building an apartment house. There they found both James and Francis O'Connell and Houlihan introduced James to Henry, after which Houlihan drove Henry to the Bronx River Inn for lunch. At lunch he told Henry that he wanted to get Francis in 2A or 3A classification, said that he knew Henry wasn't going to do this for nothing, asked the latter how much it would cost and finally queried whether it would be $1,000, and Henry said "yes." Houlihan said that James, the registrant's father, had plenty of money and would be willing to pay to get a 2A or 3A classification, that he—Houlihan—didn't want a penny, but only wanted to get Francis in a 2A or 3A classification. Henry said he did not know that he could do anything but would see what could be done. After lunch Houlihan drove Henry to the latter's home. On May 19, Henry again met Houlihan by appointment and they again discussed the O'Connell case. Houlihan said he wished to go to Martha Avenue again and meet James O'Connell. He drove Henry to a point near there, got out of the car and walked over to where James

O'Connell was and talked with him. Houlihan then returned to the car, drove Henry around in it for a few minutes, went back to Martha Avenue, got out of the car and talked with Francis, who had in the meantime arrived at Martha Avenue and told Henry that he had informed Francis that he was going to get him a 2A or 3A classification and was going to speak to his father about the $1,000. Houlihan said to Henry: "Everything is all set * * *. We will go back there and you can talk to Mr. Francis O'Connell. Straighten it out with him * * * and whatever way you handle it will be all right with me." At the suggestion of Houlihan, Henry then got into Francis' car. While the two were together in the car, Francis said he understood the case was to "cost * * * a thousand dollars" and tried in vain to persuade Henry to accept a small payment down of $200 or $300 and to receive the balance in a few weeks. Henry said: "No, forget all about it," to which Francis replied: "I will get the check from my father and cash it at the bank on 219th St. White Plains Road." Thereafter Francis stopped at DeVoe and McLean Avenues, left Henry there and went back to Martha Avenue, picked up his father and took him to the bank where Francis cashed a check for $1,042 that was signed "James O'Connell" made payable to the latter and endorsed by Francis in James' name. On the back of the check, in the handwriting of Francis, were the words: "To pay Pat Pettit for account 236th St." Pat Pettit was the contractor for the plumbing installation at the Martha Avenue job. According to Pettit's testimony James O'Connell told him that Francis had got into trouble in connection with the draft and that money was involved. James thereupon asked Pettit to say that he had been paid the $1,000 derived from the check for $1,042. Pettit replied that he did not get the money and that he "didn't want to have anything to do with it." After cashing the check at the bank Francis returned to DeVoe and McLean Avenues and gave Henry twenty $50 bills. On this occasion he told Henry that he had previously been able to get his reclassification changed from 1A to 3A by the Appeal Board because of a "contact" he had established. In other words, he admitted to Henry that he had been engaged in objectionable manoeuvering during the earlier stages of his attempts to obtain a deferred classification.

The testimony of Henry was confirmed in numerous particulars by other witnesses for the government who had been assigned to watch the dealings between himself and the defendants. Francis took the stand on behalf of himself and his father and swore that the proceeds of the check for $1,042 were for the purpose of making an advance to Pettit and that before he had a chance to make the advance the moneys were taken from him by one of the government agents who had been trailing him. He absolutely denied that it ever was in the hands of Henry. He also denied that he had any corrupt agreement with either Henry or Houlihan to have his classification deferred in consideration for the payment of $1,000. Houlihan also took the stand and denied being a party to a corrupt bargain and said that he did no more than accede to the request of James O'Connell, who needed to retain the assistance of his son, and ask Henry to investigate the Francis O'Connell case thoroughly so that if it was meritorious Francis might stay with his father until the Martha Avenue job was finished. But while the O'Connell case was being investigated by the United States Attorney, Houlihan admittedly made numerous misleading statements calculated to obstruct justice which, in spite of the good reputation his character witnesses gave him, greatly lessened the value of his denials. The evidence connecting James O'Connell with the conspiracy was also ample. In April, 1941, he sought the services of Houlihan in order to get a deferred classification for Francis and on May 15 requested Houlihan to speak to Henry for the same object. He signed the check that Henry said was used to raise the $1,000 and tried to get Pettit to lie about the use of the money. He was frequently with Houlihan and Henry while the corrupt bargaining was going on.

There can be no doubt that there was substantial evidence from which a jury might find that the defendants were engaged in a conspiracy to evade the Selective Training and Service Act.

The question of chief importance is whether Section 11 of the Selective Training and Service Act is restricted by its terms to conspiracies to "hinder or interfere in any way by force or violence with the administration of this Act." While the terminology of Section 11 is awkward and not as perfectly clear as we might wish, nevertheless we think that

conspiracies to violate any of the substantive offenses described in the section are within its purview. Commas are inserted between the different substantive offenses set forth and the words "or conspire to do" would not have been preceded by a comma (as they are) if they had been intended to relate only to hindering the administration of the Act "by force or violence" and not to the other enumerated offenses. Accordingly the disjunctive clause "or conspire to do so" includes conspiracies to commit all the preceding offenses. It is argued that such an interpretation disregards the fact that the word "conspire" is in the plural and thus grammatically relates to the clause "or any person or persons who shall knowingly hinder or interfere in any way by force or violence with the administration of this Act," and not to the earlier clauses beginning with the words "any person," which are in the singular. While the word "conspires" should properly have been used as the predicate of earlier subject clauses beginning with the words "any person," the subjects of the verb are the various clauses in the singular but also the later words "any person or persons" that are in the plural. Interpreting the section as a whole, the subjects of the verb "conspire" are various, some in the singular and some in the plural, so that the word "conspire" was naturally enough placed in the plural.

It is further contended that since a conspiracy to violate the statute by force and violence is a much more serious offense than one to violate it by other means such a conspiracy was the only one denounced. But this argument is more specious than sound. If such was the basis for differentiation, a severer penalty would have been provided for the substantive acts of force and violence than for the other acts that were forbidden.

The language of Section 11 of the Selective Training and Service Act of 1940 was largely copied from that of the Selective Draft Act of 1917, 50 U.S.C.A.Appendix, § 201 et seq., with the addition of the clause prohibiting "force or violence" and the conspiracy clause. The form of the Act of 1940 indicates an intention to place all substantive acts of violation and all conspiracies to commit any of those acts upon an equal footing.

Finally it is objected on behalf of the defendants that the indictment did not charge the commission of any overt act. This was plainly unnecessary. The section of the Selective Training and Service Act with which we are dealing contains no provision requiring the doing of any act by one of the conspirators to effect the object of the conspiracy. As at common law the conspiracy itself is the offense. In this respect the Selective Training and Service Act resembles the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 Note, and differs from the general conspiracy statute, U.S.C.A. Title 18, § 88, which requires an overt act. Nash v. United States, 229 U.S. 373, 378, 33 S.Ct. 780, 57 L.Ed. 1232; Enfield v. United States, 8 Cir., 261 F. 141.

The judgments of conviction are affirmed.