**UNITED STATES v. KEEGAN et al.**
No. 53.
Circuit Court of Appeals, Second Circuit.
Feb. 29, 1944.
Writ of Certiorari Granted May 15, 1944.
See 64 S.Ct. 1143.

Wilbur V. Keegan, of New York City, pro se.

John F. X. Finn, of New York City, for appellants Kunze, Klapprott, Schwinn, Fentzke, Rapp, Weiss, Wendlandt and Streuer.

Theodore Kiendl, of New York City (William H. Timbers, of New York City, of counsel), for appellants Christoph, Fitting and Kunz.

George S. Leisure, of New York City (E. Compton Timberlake, of New York City, of counsel), for appellants Agne, Borchers and Knupfer.

Joab H. Banton, of New York City, for appellants Belohlavek, Ottersbach and Schatz.

George C. Norton, of New York City, for appellants Bregler and Berg.

Albert C. Rothwell, of New York City, for appellants Bachmaier and Schneller.

Leo C. Fennelly, of New York City, for appellant Elmer.

Harold W. Hastings, of New York City, for appellant Willumeit.

James B. M. McNally, U.S. Atty., of New York City (Peter J. Donoghue, Louis Bender, and John C. Hilly, Asst. U. S. Attys., all of New York City, George Jaffin, Sp. Atty., Department of Justice, of Washington, D. C., of counsel), for appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

■ It is argued on behalf of several appellants that Section 11, 50 U.S.C.A. § 311, of the Selective Training and Service Act, under which the indictments were laid, is unconstitutional because of the provisions of Section 8(i) in which Congress declared as a policy that a vacancy caused in employment by reason of induction of an employee into the service of the United States should not be filled "by any person who is a member of the Communist Party or the German-American Bund." It is unnecessary to do more than advert to Section 14(b) of the same act which says: "if any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of this Act, and the application of such provision to other persons or circumstances, shall not be affected thereby." We need not say whether Section 8(i), which apparently was only designed to express a congressional policy and not a legislative mandate, can fairly be interpreted as going further. The separability clause we have quoted is enough to leave the enactment in Section 11 proscribing evasion of service in the land and naval forces, and conspiracies to do this, unaffected by any constitutional questions as the validity of Section 8(i). Electric Bond & Share Co. v. S. E. C., 303 U.S. 419, 434, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 86 L.Ed. 1062, 86 A.L.R. 403; Reitz v. Mealey, 314 U.S. 33, 39, 62 S.Ct. 24, 86 L.Ed. 21. Congress plainly had no intent to have the whole act conditioned on the validity of Section 8(i). Indeed, to impute such an intent seems fantastic.

■ It is further argued that the indictment was insufficient because the only conspiracy which could be charged under the statute would be one to hinder or interfere with the administration of the act "by force or violence." This same objection to a similar indictment was specifically raised in United States v. O'Connell, 2 Cir., 126 F.2d 807, certiorari denied Houlihan v. United States, 316 U.S. 700, 62 S.Ct. 1297, 86 L.Ed. 1769. There we held that Section 11 embraces conspiracies to violate any of the substantive offenses described in the section, and is not limited to conspiracies to "hinder or interfere in any way by force or violence."

■ There is the further claim, which we think to be unsubstantial, that the evidence was insufficient to sustain the charge. The proof indicates that the defendants were part of a large organization, one of the purposes of which was to interfere with the administration of the Selective Training and Service Act. The Bund did everything it could to prevent the passage of the Act, and finally, when the law was enacted, advised its members to "refuse to do military service", until any laws of the country or of the state which affected the citizenship rights of members were repealed. All of the appellants, unless possibly Schneller, have already been shown to have participated in the formulation or the promulgation of Order 37, which definitely advocated resistance. We think even the appellant Schneller was implicated for, in October, 1940, he had written a newspaper article attacking the draft; in December, 1940, he was visited by Kunze at Erie, and thereafter, at least as early as June, 1941, became a unit leader. These relations with the activities of the Bund were sufficient to justify the submission to the jury of his participation in the conspiracy.

■ It is also contended that Section 11 is in terms applicable only to conspiracies to counsel others to "evade" service and that the present indictments must fail because no artifice was employed in the present case. But the word "evade" includes not only furtive acts of evasion but also, in our opinion, covers any form of refusal or resistance. Indeed the word derivatively means no more than "go away" or "escape from", whatever be the means of accomplishing the purpose.

■ The appellants claim error because the judge charged the jury that an intention on the part of the defendants to bring a test case to determine the constitutionality of Section 8(i) of the Selective Training and Service Act was immaterial to the guilt or innocence of the defendants. He charged that a "bona fide honest intent to make a test case was no defense", saying that "if there was a con-spiracy amongst these defendants or any of them having as its object the violation of the Selective Service Law, knowingly, the reason for such violation is immaterial to you in your consideration of the question of their guilt or innocence". It is argued that the question of so-called "corrupt intent" could not properly be withdrawn from the jury. The logical alternative to the rule the judge laid down is freedom to conspire to violate any statute whenever it is thought there is doubt about its constitutionality, however erroneous the contention may prove to be. We are referred to various decisions such as People of the State of New York v. Powell, 63 N.Y. 88; People of the State of New York v. Flack, 125 N.Y. 324, 26 N.E. 267, 11 L.R.A. 807; and Landen v. United States, 6 Cir., 299 F. 75, 78, 79, which indicate that for a conspiracy to exist there must be a corrupt motive. We hold that to establish violation of the statute nothing more has to be proved than that the parties "had in contemplation all the elements of the crime they are charged with conspiracy to commit." United States v. Mack, 2 Cir., 112 F.2d 290, 292; Hamburg-American Steam Packet Co. v. United States, 2 Cir., 250 F. 747, 759; Chadwick v. United States, 6 Cir., 141 F. 225, 243.

Counsel also assign error because of the mode of the selection of the jury. The applicable statute appears in Title 28, Section 424 of the United States Code Annotated and is quoted below.[2] The court adopted a practice for the trial which has been frequently employed and under which peremptory challenges were to be exercised under the so-called alternating system. Under this, the defendants were all together allowed two challenges, then the government one, and so on until the defendants had exercised or waived challenges to the number of eight, then the defendants were required to exercise or waive one, and the government one, and then the defendants one and the government one. Thus the government would have the final challenge. No objection was made to this system until the defendants had

---

2 "§ 424. (Judicial Code, section 287.) *Challenges.* When the offense charged is treason or a capital offense, the defendant shall be entitled to twenty and the United States to six peremptory challenges. On the trial of any other felony, the defendant shall be entitled to ten and the United States to six peremptory challenges; and in all other cases, civil and criminal, each party shall be entitled to three peremptory challenges; and in all cases where there are several defendants or several plaintiffs, the parties on each side shall be deemed a single party for the purposes of all challenges under this section. All challenges, whether to the array or panel, or to individual jurors for cause or favor, shall be tried by the court without the aid of triers."

exercised, or had an opportunity to exercise, nine challenges, and there remained one challenge for them and one for the government. At that point the jury was declared by defendant's counsel to be satisfactory, but they asked leave to defer the exercise of their last challenge in case the government should exercise its final challenge. The court thereupon said: "The defendants were given the privilege of exercising their right to challenge first, and I don't think it would be fair to change that at the end. I think that alternating system should be followed throughout. So I will say now to defendants' counsel that they may exercise the privilege of a peremptory challenge at this time or the court will consider that they have waived it." To this ruling appellants' counsel excepted. The defendants declined to exercise the last challenge they had under the court's ruling. Thereupon the government exercised its last challenge in respect to juror Number 9, who was excused accordingly. The box was then filled by drawing another juror and the jury as thus constituted was sworn, but, before the trial began, defendant's counsel stated to the court, in the absence of the jury, that the juror who had been drawn in place of Number 9 was not satisfactory to them and that they had had no opportunity to challenge her. The court said: "I think the record already shows that." In other words, they maintained that they should have been allowed to exercise their last challenge after the government's challenges had been exhausted.

In Pointer v. United States, 151 U.S. 396, 410, 14 S.Ct. 410, 415, 38 L.Ed. 208, a unanimous court, speaking through Justice Harlan, enunciated the general rule that where, as in the case at bar, "the subject is not controlled by statute, the order in which peremptory challenges shall be exercised is in the discretion of the court." In Lyon v. State, 116 Ohio St. 265, 155 N.E. 800, the Supreme Court of Ohio, relying on Pointer v. United States, supra, sustained the very method of exercising challenges which the trial judge adopted in the case at bar. In Commonwealth v. Piper, 120 Mass. 185, the court said that "the statutes conferring and defining the right of challenge in capital cases contain no provisions as to the order and time in which the rights shall be exercised by the government or by the defendant * * *. There is no general rule of court upon the subject, and all directions

as to the time when and the mode in which either party shall challenge, except so far as regulated by the statutes, like other matters affecting the proper conduct and order of the trial, are within the discretion of the court." See also Philbrook v. United States, 8 Cir., 117 F.2d 632, 635, certiorari denied 313 U.S. 577, 61 S.Ct. 1097, 85 L.Ed. 1534. The appellants were deprived of no right to exercise one of the peremptory challenges given them by statute, but were merely required to exercise their challenge at a particular time. We are clear that the court in adopting the alternating system infringed no legal right of the defendants and that the jury was properly selected.

The most important question before us is whether certain written statements signed by Kunze and Wendlandt were improperly received in evidence, and whether, if so, they were prejudicial to any of the defendants other than themselves. The trial judge admitted them only as against these defendants and charged the jury that they were binding on no one else.

Kunze was arrested in Texas on July 4, 1942, by a Special Agent and brought to New York by airplane, where he arrived Sunday morning, July 5, at 8:15 A.M. He was then taken to the New York office of the F.B.I., fingerprinted, photographed and locked in a cell, and arraigned on Monday, July 6. At about 11 A.M., on July 5, he was questioned by F.B.I. Agent O'Neill after being informed that he did not have to make any statement unless he so desired, and that if he made a statement it might be produced in court against him. He was also advised that "no promises, immunity, or remuneration would be made to him". O'Neill asked him various questions relating to his activities and he answered them; thereafter the answers were reduced to statement form by O'Neill, and certain paragraphs were incorporated which Kunze himself dictated to the stenographer. These paragraphs were pointed out at the trial by O'Neill. The questioning began 11 A.M., Sunday July 5, and ended at 5 A.M. July 6. It was not continuous, and there is no claim that threats or force of any kind were used to procure it, and Kunze so asserted in the signed statement itself. O'Neill testified that Kunze was given an opportunity to read and make corrections in the statement prior to signing it.

We think there can be no doubt that prior to the decisions of the Supreme Court

in McNabb v. United States, 318 U.S. 332, 333, 63 S.Ct. 608, 87 L.Ed. 817, and Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829, the admission of the statement would have been allowed, on the ground that it was voluntary. Lisenba v. California, 314 U.S. 219, 239, 62 S.Ct. 280, 86 L.Ed. 166; Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090. Indeed, there seems to have been no evidence and to be no claim that Kunze was threatened or coerced in any way, or that rudeness of manner was resorted to in questioning him. While he at the time had no lawyer, he did not ask for counsel.

It is to be noted that Kunze's statement contains nothing directly bearing on the issue in the case that Kunze was largely instrumental to the drafting and promulgation of Order 37 counseling resistance to the draft. It contains the statement that Kunze traveled about the country without procuring permission of his local draft board, and similarly entered Mexico with a view to prolonging his journey to Germany and becoming a German citizen. It contains statements of dissatisfaction with the war policies of the national administration, particularly that of friendship with Russia, and of his intention to abandon his United States citizenship and to become a German citizen. He also stated in it that if war were between Germany and Russia or between Germany and England his sympathies would be exclusively with Germany; and in respect to American-Japaneses hostilities. that his sentiments "would be favorable to Japan to the extent that a nation of one hundred million people needs a certain amount of room in which to live, unless it is to be condemned to a voluntary suicide". It added that: "If the war were confined to American-German hostilities, I should want to see a negotiated peace with the United States, with Germany predominant in Europe and the United States the ruling power in the Americas". He concluded his statement with the following:

"At the present time I do not consider myself to be a citizen of the United States of America, but rather as a German national.

"It is my honest opinion that Mr. Roosevelt, through his international policies, provoked war with Japan and with the European powers presently aligned against him.

"The foregoing statement, consisting of three typewritten pages, has been read to me and by me, and as evidence of the truth and of its entire contents, I sign my name below and my initials to each page thereof.

"The foregoing statement is the truth to the best of my knowledge and belief."

It is evident that Kunze's statement contained no direct proof of his connection with the conspiracy and did not mention the Bund, or any of the appellants, or their activities, but only showed that he was an ardent German sympathizer, was dissatisfied with his United States citizenship, proposed to leave the country and become a German citizen, and would be against most things which are now part of our national policy. It furnished no direct proof against him on the primary issue of counseling resistance to the draft. The showing of sympathy with Germany and Japan and of opposition to our national policies was substantiated by all the proof in the case and particularly by Order 37 and by the Bund newspaper for which Kunze as Bundesfuehrer was clearly responsible.

█ The defendant Wendlandt was the Buffalo Unit Leader. F.B.I. Agent Young first met him on April 9, 1942, at the F.B.I. office in Buffalo late in the evening and questioned him concerning his Bund activities. Wendlandt, not then under arrest, at first denied that he was a member of the Bund, but later admitted that he had been a member and that he had Bund mail delivered to him under the name of Wendel, and had been unit leader. During the interview one Marie Kraus came into the office. Young accompanied her to her home which he entered with her permission. There he found Bund paraphernalia which Wendlandt identified as belonging to him and said that he had given it to Miss Kraus to hide in her attic. It contained photographs of Hitler and Hess and various insignia. At the time of the first interview Young asked Wendlandt to make a signed statement of what he had said, but the latter said he wished to think the matter over. On May 5, 1942, Wendlandt called Young on the telephone and arranged a meeting for the morning of May 6. On that day a statement was dictated by Young in the presence of Wendlandt, and which the latter read and corrected in some respects and then signed. He was informed by Young that he did not have to make it

and that it was possible that it might sometime be used against him in a court of law. He was also advised that he might have an attorney, but said that he did not wish one and was perfectly willing to sign any statement that was true. Another statement was made by Wendlandt on May 26, 1942. Both the one of May 6 and May 26 were admitted in evidence and he was not under arrest and subjected to no duress in the case of either.

On the afternoon of July 7, 1942, Wendlandt was arrested at his apartment in Buffalo and after being warned of his constitutional rights and of his right to have an attorney was asked to make and sign a statement. At this interview Wendlandt informed Young that he had either read or passed Bund Command 37 around at the meeting but requested that these facts should be omitted from the statement because he was uncertain about which he had done. He also said that he had discussed Command 37 at one of the Bund meetings in Buffalo. It is not shown when he was arraigned.

 We cannot see that the statement of July 8 was prejudicial to Wendlandt or to anyone else. It explicitly denied any subversive activities, denied that he was ever requested by Kunze or any other national leader of the Bund to do anything unlawful, or to give any information concerning national defense industries. He stated that he had not always followed the Bund commands, and that he had written National Headquarters about Order 37 because he did not understand it. Beyond the fact that he was interested in the Bund, was a Unit Leader and was aware of Order 37, we find nothing in the statement of importance. Everything at all

material was embodied in his prior statements of May 6 or May 26, which were made when he was not under arrest. The oral statement made by him to Young as to the promulgation of Order 37 at a Unit meeting was merely corroboration of other undisputed evidence that Bund orders were to be promulgated and that Wendlandt had made Order 37 known to the members of his Unit. The inferences of participation in the conspiracy to resist military service as required by Order 37 seems to us overwhelming. Under any view, the written statement of July 8, 1942, added nothing important to the clearly admissible statement of May 26 and was, therefore, not prejudicial.

The question remains whether the statement of Kunze of July 6, 1942, and that of Wendlandt of July 8, 1942, were technically inadmissible under the decisions of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829. The Supreme Court there held that statements procured from a defendant while under arrest are inadmissible, whether or not voluntarily made, if the arresting officer does not comply with the Acts of Congress requiring a defendant to be promptly taken before a committing magistrate.[3]

 Kunze was arrested in Texas on July 4th, a national holiday. He arrived in New York by plane on Sunday, July 5, and was arraigned on Monday, July 6, 1942, the first business day after his arrest. We are not persuaded that the Supreme Court decisions go so far as to preclude the use of every oral or written statement made by a defendant after arrest and before arraignment, if the arraign-

---

[3] 18 U.S.C.A. § 595.

"*Persons arrested taken before nearest officer for hearing.* It shall be the duty of the marshal, his deputy, or other officer, who may arrest a person charged with any crime or offense, to take the defendant before the nearest United States commissioner or the nearest judicial officer having jurisdiction under existing laws for a hearing, commitment, or taking bail for trial, * * *."

5 U.S.C.A. § 300a.

"*Federal Bureau of Investigation; authority of officers to serve warrants and make arrests; * * *

"The Director, Assistant Directors, agents, and inspectors of the Federal Bu-

reau of Investigation of the Department of Justice are empowered to serve warrants and subpoenas issued under the authority of the United States; to make seizures under warrant for violation of the laws of the United States; to make arrests without warrant for felonies which have been committed and which are cognizable under the laws of the United States, in cases where the person making the arrest has reasonable grounds to believe that the person so arrested is guilty of such felony and where there is a likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be immediately taken before a committing officer. * * *"

ment is prompt. For instance, we should not suppose that voluntary oral statements made by a defendant while on his way to the place of arraignment would be excluded, nor would we exclude voluntary written statements though made after arrest and prior to arraignment if the arraignment was not unduly delayed. We think that § 300a of U.S.C.A., Title 5, requiring the person arrested by F.B.I. officers to "be immediately taken before a committing [magistrate]", and § 595 of U.S.C.A., Title 18, dealing with arresting officers generally, ought to be interpreted alike. United States v. Bell, D.C., 48 F.Supp. 986, 994. Neither statute sets up a standard of conduct that is unreasonable or practically · impossible. In the case of each statute the arraignment must only be made with all convenient speed in a strict sense. The rule of McNabb v. United States was designed to secure prompt arraignment. With all deference we are not inclined to follow the dictum in United States v. Haupt, 7 Cir., 136 F.2d 661, 667, to the effect that all statements procured before the compliance with the statute are inadmissible. In Mitchell v. United States, App.D.C., 138 F.2d 426, where the defendant had been kept under arrest for more than a week without arraignment, the Court of Appeals of the District of Columbia held that his confession, obtained prior to arraignment, should not be received in evidence because of the ruling in McNabb v. United States. The decision clearly is not a pertinent reference for our purposes. Moreover, on · January 17, 1944, the Supreme Court granted a writ of certiorari to review it. 64 S.Ct. 485. `

We do not think that Kunze was transported to the forum in which he was to be arraigned and tried or was incarcerated after his arrival in New York in violation of the statutes providing for prompt arraignment. To expect arraignment on the Fourth of July, or Sunday, would require a promptitude that we do not regard as contemplated by the statutes. The arraignment of Wendlandt is not shown to have violated statutory requirements. But even if we are wrong in our interpretation of the McNabb decision, we think there was no error which would justify a reversal of the judgment. The guilt of Kunze was clearly proved by his undoubted participation in Order 37. His pro-German sympathies and activities and proposed abandonment of American citizenship only were important if his violation

of the Selective Training and Service Act was in doubt. The evidence of violation of the Act was all against him. His statement, therefore, had at most but a slight importance, the weight of which was completely dissipated by overwhelming proof of guilt. In the case of Wendlandt, for the reasons already given, there was no substantial prejudice in the evidence taken while he was under arrest.

In any event, none of the appellants, other than Kunze and Wendlandt, was prejudiced by the admission of their statements. Not only did the statements fail to disclose the names of any of the others but they failed to connect any of them with the conspiracy. The connection was established by other and abundant proof. In this respect the case at bar is distinguishable from Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829.

The charge of the judge that no inference was to be drawn by the jury from the failure of the defendants to take the stand is criticised by counsel for certain appellants, but under the recent decision of Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257, it was necessary because it had in substance been requested by counsel for several of the appellants. The instructions of the court in respect to the reading of newspaper articles were not only entirely unobjectionable but most sensible and useful. The motion to withdraw a juror because of the article in the Daily News of October 15 entitled "Bund Leaders Toss in Sponge at Draft Trial" was properly denied. There was no showing that any juror read the article and there is no reason to believe, if he or she did, that the testimony and the clear instructions of the court were disregarded. Jurors cannot be treated as unable to withstand any effect of newspaper publications. Indeed such a ruling would make it practically impossible to conduct trials in metropolitan centers and would treat the average sceptical juror as a helpless person.

We have considered various other objections raised by appellants and find nothing requiring further discussion.

During the whole trial the judge exercised scrupulous care and dealt with complex questions of law and fact with intelligence and fairness. In a situation where passions might run high he maintained the highest traditions of the bench.

Counsel assigned to defend the appellants likewise deserve special commendation for rendering arduous services with fidelity and skill. We have never known an appeal to be more ably conducted. They are given the thanks of the court for performing a task that can be compensated in no other way.

Judgment of conviction is affirmed as to all the defendants.