## Commonwealth *v.* Francis, Appellant.

Argued March 19, 1963.   Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Domenick Vitullo,* with him *A. Charles Peruto,* for appellant.

*F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, with him *John F. Hassett* and *Arlen Specter,* Assistant District Attorneys, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MONTGOMERY, J., June 12, 1963:

These appeals by John E. Francis, defendant, are from a judgment of sentence on one indictment charging "false pretenses" (1483) and the suspension of sentence on eleven others, viz.: 1477, 1478, 1479, charging bribery; 1484, 1485, charging false pretenses; 1487, 1488, 1489, charging extortion; and 1573, 1574, 1575, charging conspiracy; following his convictions thereof

by a jury and the dismissal of his motions for a new trial and in the arrest of the judgments. He had been tried on twenty-six indictments consolidated for trial purposes, but was successful in obtaining a demurrer to one, not guilty verdicts on four, and the arrest of judgment on nine others. All of the indictments were based on appellant's activities in connection with contracts which the City of Philadelphia had with Hughes Steel Erection Company and A. Belanger and Sons, Inc., for rehabilitation work[1] on the Frankford Elevated Railway in that city. During such activities appellant held the position of Deputy Commissioner in the Department of Public Property of that city and had the responsibility of overseeing the work being done under the contracts. Eli G. Travis, hereinafter mentioned, was Vice President of the Hughes Steel Erection Company and the owner of twenty per cent of its stock. John Hughes owned another twenty per cent and the Belanger brothers, who also owned A. Belanger and Sons, Inc., owned the remaining sixty per cent.

Appellant's present general contentions are, (1) that the evidence produced by the Commonwealth (appellant offered no evidence) was insufficient to sustain the convictions; and (2) that he was denied a fair trial for various reasons.

The cases now under consideration may be grouped as follows:

1477—Bribery and 1489 Extortion, resulting from a gift of clothing (value $305) from Travis to Francis.

1478—Bribery and 1488 Extortion, resulting from gift of television set (value $533.99) from Travis to Francis.

---

[1] The main repairs were replacement of ballasts, and repairing expansion joints, trusses, cross beams, center girders, and hand rails.

1479—Bribery and 1487 Extortion, resulting from the gift of an installment payment by Travis on a debt owed by Francis (amount $132).

1575—Conspiracy and 1485 False Pretenses, resulting from a $32,475 payment by Philadelphia City to Hughes Steel Erection Company on December 31, 1959, for work not performed.

1574—Conspiracy and 1484 False Pretenses, a similar payment of $18,635 made December 16, 1960, for work not performed.

1573—Conspiracy and 1483 False Pretenses, a similar payment of $33,440.90 made March 9, 1960, for work not performed.

### Sufficiency of Evidence

Giving the Commonwealth the benefit of all the favorable testimony and all reasonable inferences arising therefrom, the relevant facts may be stated as follows: The City of Philadelphia and the Philadelphia Transit Company, having agreed to repair the Frankford Elevated section of the transit system, advertised for bids, and as a result thereof entered into four contracts (Nos. 725, 726, 727, and 728) with the low bidder, A. Belanger and Sons, Inc. During the progress of the work under these contracts, Travis, the representative of the contractor, established friendly relations with Benjamin Barone, secretary to William T. Gennetti, the Commissioner of the Philadelphia Department of Public Property, and with Harold Varani, the acting Chief Engineer of the City of Philadelphia, who was also attached to the Department of Public Property. In return for their good will and help in performing the contracts, Travis gave and promised to give them valuable emoluments; however, since appellant was their superior, it was suggested by them that Travis meet appellant. This was accomplished and appellant shared the hospitality afforded by Travis. When

the bids were opened for the fifth contract (No. 729), neither company represented by Travis was the low bidder and the possibility of readvertising for new bids instead of awarding the contract to the low bidder was discussed by Travis with Barone and Varani, and later with appellant. This was subsequently accomplished, with the cooperation of appellant, by changing the requirements of the specifications of the contract so as to eliminate the cement work and substitute other work relating to the repair of expansion joints. With confidential information as to the estimate made by the City Engineer on the probable cost of the work covered by the revised specifications for contract 729, supplied by Barone, Varani, and at least with the knowledge and acquiescence of appellant, Hughes Steel Erection Company submitted the lowest bid and was awarded the contract. However, after performing part of the contract, Travis informed Barone, Varani and appellant that he was going to lose money and could not perform the work of "jacking the bents" (as required in the contract) for the cleaning and otherwise repairing of the expansion joints of the trackage. Item 47 of the contract covered 52 joints at $500 per joint or a total cost of $26,000 and item 48 covered 50 at $500 each or a total of $25,000. The Hughes Company did jack a few of the bents in cleaning the joints but failed to jack the others. This constituted inferior work with less effective results; nevertheless, the Hughes Company claimed and was paid the full amount of the contract price with extras totaling $44,440.[2] With full knowledge that the work had not been done in accordance with the contract appellant permitted vouchers for the payments to be prepared by and cleared through

---

[2] The original bid was $299,842. The total payments were $344,282. Voucher 10 certified that items 47 and 48 had been one hundred per cent completed for which Hughes was paid $26,000 on item 47 and $25,000 on item 48.

his office on the certificate of his construction engineer and of Varani, then his Director of Architecture and Engineering. Appellant not only enjoyed the hospitality of Travis but received from him the items of value previously mentioned.

## False Pretenses

In connection with these charges appellant argues that (1) his signature on the three vouchers on which the payments relating to items 47 and 48 of the contract were made has not been sufficiently proved; (2) the particular omissions in performance of the work have not been identified with the separate vouchers; and (3) there is no evidence that payment was made on the strength of the vouchers.

Appellant's signature does not appear on vouchers 8, 9, and 10, although he did sign the earlier vouchers 1, 2, 3, and 4 on contract 729. However, his certification is not the determining factor. Under the Act of June 24, 1939, P. L. 872, §836, as amended, 18 P.S. 4836, one who aids, assists or abets another in defrauding is guilty of the crime. Appellant, with knowledge that the contractor was not performing his contract but was nevertheless certifying that it had fully and properly performed it in order to secure full payment, was rendering aid and assistance to the defrauder by his acquiescence and failure to protect his employer's interest, even though he may not have performed the final act of certifying the vouchers.

Identifying each separate joint with one of the three vouchers would be impractical, if not impossible, and was unnecessary. The contract provided for the cleaning of 102 joints by jacking the bents. Travis testified they jacked only a few. There can be no other conclusion adopted but that some joints under both items 47 and 48 were not properly cleaned. This was sufficient since it establishes that in the case of each voucher

which referred to either item 47 or 48 Hughes fraudulently received payment for work it had not done.

From the record as a whole it can be reasonably inferred that the payments authorized by the vouchers were received by Hughes.

## Conspiracy

Since Hughes fraudulently secured money from the City of Philadelphia through the knowing cooperation of appellant and others, the verdicts of guilty are supported by the record. There was sufficient evidence on which the jury could and did find present the elements constituting conspiracy which were enumerated by Mr. Justice JONES in *Commonwealth v. Neff,* 407 Pa. 1, 7, 179 A. 2d 630, 632, quoting *Commonwealth v. Hall,* 173 Pa. Superior Ct. 285, 287, 98 A. 2d 386, 388 " '. . . a concerted action pursuant to a common design to accomplish a common purpose.' " It must have seemed clear to the jury that Travis, Barone, Varani, appellant and possibly George Smith, Jr., were engaged in concerted action to help Hughes Steel Erection Company avoid a loss on contract 729, at the expense of appellant's employer, the City of Philadelphia. This possible loss was occasioned by its low bid which had been based on information, probably incorrect, obtained from the office of appellant. However, the evidence can support but one charge of conspiracy based on the agreement or understanding of Travis, Barone, Varani and appellant made at the time contract 729 was partially performed and at which time the pending loss was realized. The preparation of the vouchers and the clearing of them through appellant's office were merely overt acts, carrying out the purpose of the conspiracy. The preparation and clearing of the separate vouchers did not constitute separate crimes of conspiracy and therefore, the three indictments for conspiracy were repetitious and the judgments on two of them

should have been arrested. We shall sustain the appeal as to the two later ones (1573 and 1574) in point of time, but not as to the earliest (1575), which will be affirmed.

### Extortion and Bribery

Appellant was tried for statutory extortion and bribery. The record shows that the District Attorney made his election to proceed on statutory extortion rather than the common law crime and the charge of the court was on this basis.

Statutory extortion is defined as: "Whoever, being a public officer, wilfully and fraudulently receives or takes any reward or fee to execute and do his duty and office, except such as is or shall be allowed by some act of Assembly, or receives or takes, by color of his office, any fee or reward whatever, not, or more than is, allowed by law, is guilty of extortion, a misdemeanor. . . ." Act of June 24, 1939, P. L. 872, §318, 18 P.S. 4318. What appellant took was clearly not for doing his duty, but in violation of same. Therefore, the first provision would have no application, and if he received something not allowed or more than was allowed by law "by color of his office", he might be guilty. We have held many times that the extraction of money or other things of value under a threat of using the power of one's office may constitute extortion. Such provision of the statute is the same as it is under the common law crime. *Commonwealth v. Burns,* 197 Pa. Superior Ct. 282, 178 A. 2d 619; *Commonwealth v. Norris,* 87 Pa. Superior Ct. 61; *Commonwealth v. Wilson,* 30 Pa. Superior Ct. 26; *Commonwealth v. Brown,* 23 Pa. Superior Ct. 470. However, in all of these cases, as well as many others examined by us, when there has been an extraction of money by "color of office" there has always been some threat, veiled or expressed, incident to it. We must therefore conclude that under the statutory definition of extortion, when the offense is

"by color of his office", some threat to perform the duty of or to exercise the rights or power of that office must be established.

Although we have recognized that the crimes of common law extortion and bribery may coincide at times, *Commonwealth v. Wilson*, supra, it is generally held that they are mutually exclusive crimes. 11 C.J.S., Bribery, §16; 5 P.L.E., Bribery, §1.

We find no evidence in the present record which, in any way, indicates that appellant secured the gifts given him by Travis through any coercion or threat, implied or expressed. Barone and Varani needed his cooperation to render the help they had promised to Travis, and even on the occasion when Travis sought a way to avoid performing part of the contract appellant was *approached*. He made no overtures to them. In connection with the first bids on contract 729, when he was approached about readvertising for new bids he was very reluctant to give out any hope that it could be accomplished. It was not until after he had told Travis it *would* be done that Travis said to him, "If you can get this thing through for me, I will pay you $3,000." This, we think, was a strictly voluntary gesture on the part of Travis. However, that promise does not concern us since appellant has been exonerated in that case.

We conclude that the evidence is *not* sufficient to sustain the convictions on the indictments charging extortion.

On the contrary, the evidence is overwhelming to sustain the convictions for bribery. Although there was some margin of dispute as to the criminal intent of appellant, an element of the case, the jury has resolved that issue against appellant.

Bribery is defined as ". . . whoever being an agent, employe, or servant, solicits, accepts, receives or takes, directly or indirectly, any commission, money,

property, or other valuable thing as an inducement, bribe or reward for doing or omitting to do any act, or for showing any favor or disfavor in relation to the affairs or business of his principal, employer, or master, is guilty of a misdemeanor. . . ." Act of June 24, 1939, P. L. 872, §667, 18 P.S. 4667.

Appellant was an agent and employe of the City of Philadelphia, he took the gifts aforementioned, he did favors for Travis, and he omitted doing acts required of him in the protection and furtherance of his employer's interests. It was for the jury to determine whether the favors shown and the acts omitted were induced by these gifts. Although the purpose of such gifts is not generally expressed, since such matters are secretive, the circumstances under which they are given may be properly considered by the jury in resolving the issue. *Commonwealth v. Friedman,* 193 Pa. Superior Ct. 640, 165 A. 2d 678. The established circumstances in this case were sufficient to sustain the verdicts of guilty on the bribery charges.

## Trial Errors

Reference to an investigation of "alleged frauds" in the trade-in of city motor vehicles by Commonwealth witness Alan Hyman, Deputy Personnel Director, and Commissioner Gennetti was not prejudicial error. Mr. Hyman was called for the purpose of establishing the duties, salary, and work records of appellant, Varani and Barone. Counsel for appellant, on cross-examination, then undertook to establish his client's reputation for integrity and competency by questions and answers covering fifteen pages of the record. The District Attorney thereupon undertook to refute the impression this created by interrogating further as to the cause of appellant's separation from the city. In this further interrogation the matter of the investigation was mentioned and that appellant had been included in it. How-

ever, it was further shown that although there were several dismissals as a result of the investigation, Mr. Francis had not been dismissed. He resigned months later.

Appellant complains next that the Commonwealth did not produce or make available essential witnesses. Many of these were witnesses to transactions not presently under consideration by us and their testimony was in relation to other charges from which appellant has already been exonerated. However, as to those who had any connection with the cases now before us, we find no error. A district attorney normally has the duty to produce eyewitnesses, but if he does not wish to use them he should make them available to the defense. *Commonwealth v. Drew,* 190 Pa. Superior Ct. 478, 154 A. 2d 285. He need not call all witnesses named in an indictment or even all eyewitnesses if he believes, after examination or investigation, that their testimony is unreliable, or unworthy of belief, or surplusage or irrelevant. His only obligation under those circumstances is to notify defense counsel he does not intend to call all of the named witnesses. The calling of witnesses is within the discretion of the district attorney under the general supervision of the trial judge. *Commonwealth v. Horn,* 395 Pa. 585, 150 A. 2d 872. The lower court did not consider, and we think properly, Walter Mathias, an employe or agent of Travis who may have made the car payment for Travis, or certain unidentified inspectors on the transit jobs, or the dummy stockholders of the Consolidated Industries, Inc. (another of Travis' enterprises), such persons as the District Attorney was compelled to call, or make available. Furthermore, they were all known to appellant. Varani and Barone were under indictment for their participation in the matter and were likewise known and available to appellant had he wished to call them.

Appellant's next assignment of error is that the court improperly and over objection admitted testimony of Commissioner Gennetti concerning an interrogation of the appellant by the City Controller, Alexander Hemphill, on or about April 15, 1961. The record shows that the District Attorney asked Commissioner Gennetti only whether he had been present in the office of the City Controller on April 15, 1961, when Mr. Francis was interrogated, and then asked the court to identify the sworn statement as "Exhibit 11g". This was allowed over appellant's objection. The District Attorney thereupon asked the witness to describe the circumstances under which it had been taken. He asked nothing about the content of the document and proceeded to another phase of the case, after which he turned the witness over to appellant's counsel for cross-examination. On cross-examination appellant's counsel asked further about the circumstances surrounding the taking of the statement, and referred to the statement for the purpose of determining the circumstances that existed during the time it was taken. The following colloquy between the court and defense counsel demonstrates the situation very clearly:

(Page 246) "Mr. Peruto: At this point I should like to make it abundantly clear that I am cross-examining for the purpose of admissibility of the statement, and it is not to be construed in any fashion that I am having it testified to open the door, as it were, to having the statement read.

. . .

(Page 247) "The Court: . . . You know, gentlemen, the interesting part of this is that there was a statement mentioned and that is all. There was nothing more.

"Mr. Peruto: Over objection, I might say.

"The Court: That's right, over objection. Now, Mr. Peruto, under cross-examination you are making use

of a statement about which we have heard nothing, and as Mr. Fitzpatrick says, you are opening the door. You may proceed and determine just how far you go with this, and the Court will determine how far Mr. Fitzpatrick may go."

Thereupon Mr. Peruto made particular references to the statement in asking questions as to whether appellant was accused of lying, given an opportunity to secure counsel or advised of his constitutional rights. Finally, the witness was asked by the court if the answers had been given voluntarily. His reply was (Page 254):

". . . I would say if he had been some one coming in off the street and not a city employee, I might conclude that there was no duress; but being a city employee made all the difference in the world. He had a job at stake, and I guess he had really but little choice to answer questions in fear of losing his job."

On redirect examination by the District Attorney the court ruled that (Page 259):

". . . I have permitted wide latitude to defendant's counsel on cross-examination. The door has been opened, and I am permitting on redirect examination the privilege of allowing the district attorney to proceed with his questioning on matters which were brought out on cross-examination. . . ."

Relying on this ruling, and ostensibly to overcome the implication that appellant had been compelled to give false answers to questions put to him, the witness was asked whether he had given any false answers. The witness said he could not answer such a question. Thereupon the District Attorney asked specific questions relating to appellant's position in the Department of Public Property, and as to his acceptance of gifts (all other questions related to duress), to establish that appellant had not been forced to give false answers. The witness testified that appellant had given

the correct answers as to his position and had denied the acceptance of any gifts. There was nothing prejudicial to appellant in these questions and answers. In fact, they may have been beneficial to him.

In its charge, the jury was instructed concerning it, viz., "C-11g was a statement of the defendant which I had ruled out. You are not to consider that." We cannot say the lower court abused its discretion in acting as it did on such a controversial point of the case. In ruling out the statement it sustained appellant's position that it had been obtained under improper circumstances and was therefore not to be considered.

In view of the fact that appellant's counsel indicated no objection to the offer of Exhibits C-13, C-14, and C-15, which were the only ones relating to these cases before us (Page 590), we do not consider this assignment of error as meriting our discussion as it relates to them.

As to Exhibits C-11a, C-11b, C-11c, C-11d, and C-11f being correspondence between Varani and the independent engineers on these jobs, Yule, Sticklen, Jordan and McNee, between Varani and the Procurement Department of the city, and other interdepartmental memoranda, appellant's only objection to them was that they had not been properly identified. Our review of the record leads us to a contrary view.

The conspiracy charge previously discussed in this opinion was sufficient to make admissible the statements of the coconspirators, as given by Travis, which related to the cases now before us.

We find no prejudice to warrant a new trial on account of any alleged delay in bringing these cases to trial. The granting of a continuance is discretionary with the lower court and we find no abuse of that discretion present in this case.

The remaining arguments of the appellant deal with the same subject of prejudice arising from the acceptance of incompetent testimony, remarks of the District Attorney, of the court, of the Commonwealth, of the press, radio and television, and of the general public, creating, as expressed by appellant's counsel, "The Atmosphere and Tone of the Entire Proceedings". We have studied very carefully appellant's arguments, as well as the record, but fail to find any reason for the grant of a new trial.

In cases of public importance involving matters of public interest and public officials, the creation of "Atmosphere and Tone" to the proceedings cannot be avoided. However, unless the jury is prevented thereby from reaching a fair and impartial verdict, it does not compel the postponement of the trial or a retrial.

The jury was selected in this case after separate voir dire interrogations during which each juror was asked if he or she had read anything about the case in the newspapers.

In his learned and careful charge, Judge REIMEL admonished the jury to put aside all prejudice and sympathy, to decide the case on the evidence before it, and not upon any suspicion, particularly:

"You may have heard or read something about other scandals in the city in other departments having occurred over the weekend. It has nothing to do with this case, and therefore you were not cautioned about not reading or talking about anything else other than this case, but perchance maybe you have or you have heard some one discuss it or you have read the newspapers. I must caution you that you in rendering your verdict in this case must confine yourselves without suspicion and without prejudice and without sympathy and without consideration of any other thing which has happened in any other place other than in the evidence before you. So, you must disregard any such

thing, and if anything should happen to be in the back of your mind, dismiss it."

Further, the fact that appellant was exonerated on four of the charges indicates the fair-mindedness of the jury and that it was not swayed by prejudice against appellant.

Nor do we find any abuse of discretion by the lower court in refusing appellant's pretrial motions.

The record indicates the able handling by the lower court of a difficult situation, and we are of the opinion that appellant had a fair trial with full observation of his constitutional right to due process of law.

This appeal is sustained as to the three charges of extortion, being 1487, 1488, and 1489, July Sessions, 1961, and on the two charges of conspiracy at 1573 and 1574, July Sessions, 1961 of the court below, on each of which sentence was suspended, and appellant is discharged on those charges; but the appeal is dismissed as to the charges of bribery at Nos. 1477, 1478, and 1479, July Sessions, 1961, on each of which sentence was suspended, and as to the charges of false pretenses at 1483, 1484, and 1485, July Sessions, 1961, on the first of which judgment of sentence was imposed (1483), and on the remaining two, suspended (1484 and 1485), and as to the charge of conspiracy at 1575, July Sessions, 1961, on which sentence was also suspended;

And appellant is ordered to appear in the court below at such time as he may there be called, and that he be by that court committed until he has complied with his sentence or any part of it which had not been performed at the time he was released on bail by the lower court.