STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
EDWARD SAVOIE, DEFENDANT-APPELLANT.

Argued March 3, 1975—Decided June 16, 1975.

*Ms. Lois A. DeJulio,* Deputy Attorney General, argued the cause for plaintiff-respondent (*Mr. William F. Hyland,* Attorney General, attorney).

*Mr. Robert A. Coogan* argued the cause for the defendant-appellant (*Messrs. Saling, Moore, OMara & Coogan,* attorneys; *Mr. Daniel M. Waldman,* on the brief).

The opinion of the court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. This appeal presents important issues relative to criminal intent and to the meaning of the statute dealing with extortion by a public officer, *N. J. S. A.* 2A:105–1. Under what circumstances does the acceptance by a municipal building inspector of a cash "Christmas gift" from a builder constitute a violation of the statute?

Defendant was indicted on two counts: (1) misconduct in office (*N. J. S. A.* 2A:85–1); and (2) an unlawful taking of money, contrary to the statute cited above. At the trial, before a jury, the first count was dismissed at the end of the State's case. There was a conviction on the second count. On appeal to the Appellate Division, the judgment was affirmed by a divided court, and the case is here as a matter of right. *R.* 2:2–1(a)(2). There were separate opinions by the majority judges, and by the dissenting judge. The crux of the differences among the judges related to the adequacy of the charge to the jury as to requisites for a culpable state of mind of the defendant.

*N. J. S. A.* 2A:105–1 reads as follows:

Any judge, magistrate or public officer who, by color of his office, receives or takes any fee or reward not allowed by law for performing his duties, is guilty of a misdemeanor.

Defendant was appointed as the sole building inspector for Marlboro Township on or about January 5, 1970. He was

charged with enforcing the building code throughout the township. His duties included the inspection of building plans, issuance of building permits, on-site inspection of buildings under construction for code compliance, and issuance of certificates of occupancy.

During the calendar year 1970 defendant had occasion to devote as much as 65 to 70 percent of his time inspecting a large development called Whittier Oaks which was being built in Marlboro by the U. S. Home and Development Corporation. Because the site and building plans of that project had received township approval prior to his employment, defendant's activities relative thereto were apparently limited to on-site inspections and final inspections prior to issuing certificates of occupancy.

On or about the 24th day of December, 1970 defendant was given a sum of money in an envelope — the amount is in dispute and was either $150 or $250. It was received on the project site from Philip Frank, vice-president of operations for U. S. Home and Development Corporation, who wished defendant a Merry Christmas, or words to that effect, and departed immediately. Defendant had not solicited the money.

Savoie testified he believed the money had been given him "because of the good service [he had] rendered to U. S. Homes". This "service" consisted of making inspections of U. S. Home's project as soon after the corporation called to indicate a dwelling's readiness, as his time and schedule would permit. The code allows a 48 hour period to inspect trench work, backfills, and framing, and up to 10 days to complete a certificate of occupancy inspection. Defendant testified that he acted quickly upon U. S. Home's requests for inspection and that this type of expedited service was routine as he conducted himself similarly with any other persons who had a home to inspect.

Defendant told an investigating detective that he did not feel it was wrong to take the money. He regarded it as a

Christmas gift given him in appreciation for the fact he did not hold the company up awaiting his inspections. There was no evidence of defendant having defaulted in any way in respect of his duty to make proper inspections of the builder's home-sites.

The trial record reflects the fact that at the same 1970 Christmas season the builder made gifts also to a number of other municipal officials.

At the close of testimony the defendant requested the following charges to the jury relative to "criminal intent":

"8. Criminal intent necessary to complete the crime charged against the accused must be proved by the prosecution beyond a reasonable doubt.

14. The word 'knowingly' as used in the indictment and in the statute [*sic*] means intentionally, and with an awareness and consciousness of what one is doing. The word 'wilfully' as used in the indictment and in the statute [*sic*] connotes *an intentional violation of the law*. Mere mistake or neglect is not sufficient to spell out these elements of the offense.

15. A defendant who actually does violate the law *would not be guilty of the criminal offense alleged unless he is either conscious of the fact that what he is doing constitutes a violation of the law*, or unless he totally disregards the law and pursues a course without making any reasonable effort to determine whether the plan he is following would constitute a violation of the law or not. Unless you find beyond a reasonable doubt that the defendant committed the unlawful acts which are charged wilfully and knowingly, there must be a verdict of not guilty." (emphasis added).

Defendant also requested the following charge as to "demand":

"22. Without a demand, either expressed or implied, on the part of a public official there can be no crime of extortion. If you find that the transfer of money to the defendant was unaccompanied by a demand, then you must acquit the defendant."

The trial court refused these requests and did not charge the jury at all as to intent. When defendant, on exception to the charge as delivered, argued that "the element of knowledge and *mens rea*, or either of them, are implicitly involved in this statute", the court responded: "I will not charge it".

The essence of the court's charge as to the elements of the offense, after quoting the statute, was:

"To sustain a violation of that statute. there are four essential elements which the State must prove to your satisfaction beyond a reasonable doubt and those four elements are these:

Number one, that Mr. Savoie was a public officer.

Number two, that by color of his office he, three, took money, four, that was not due to him.

Four elements, a public officer who by color of his office took money that was not due to him.

Those are the four essential elements which the State must prove to your satisfaction beyond a reasonable doubt.

If the State proves those four elements to your satisfaction beyond a reasonable doubt, you would be entitled to convict Mr. Savoie."

The court told the jury it was "conceded" that three of the "elements" had been "fulfilled" — that defendant was a public officer; he had received money; and the money was not due to him. The only element in dispute was whether he had received the money by color of his office. The court defined the latter requirement as meaning "that the money received by the officer was in connection with the performance of his official duties." The court added that "it makes no difference whether the handing of the money over, or the receipt of the money is called a gift or a tip or anything of that nature."

The defense excepted to the charge for refusal to charge the requests and on the additional ground that the peremptory instruction that the money was not due the defendant, coupled with the vague charge on "color of office", left open the inference that the defendant could not have innocently received the money "under any circumstances whatsoever"; and that the effect of the charge was to eliminate from consideration the possibility that

"he may have gotten the money in a capacity unrelated to the performance of his public position * * *. If this jury legitimately felt that what he got was a gift unrelated to his *taking a fee or reward for the performance of his office*, wouldn't that entitle him to an acquittal?" (emphasis added).

The court responded: "I don't think so."

During the course of its deliberations the jury requested clarifying instructions as to "color of office". The court in response essentially repeated its prior explanation, as stated above.

I

■ We deal first with defendant's contention that he was entitled to grant of his motion for an acquittal on the ground there was no proof of demand or pressure by defendant on the donor of the money for its payment. This construction of the statute, notwithstanding its seeming support in the common law classification of the crime as "extortion", was rejected by this court in *dictum* in *State v. Begyn,* 34 *N. J.* 35, 45 (1961) and in the holding in *State v. Matule,* 54 *N. J. Super.* 326, 330, 332 (App. Div.) certif. den. 29 *N. J.* 583 (1959). While we conceded in *Begyn* that the purpose in mind when the original statute was adopted (*L.* 1796, p. 98, *Paterson, Laws* (1800) p. 212) was to penalize an officer who "insisted" without justification on a larger fee than due or on a fee when none was due for the performance of his duties (34 *N. J.* at 46), we plainly implied that the later cases had established criminal liability for the taking alone, under the statutory conditions, without the prerequisite of threat or demand. *Id.* at 45. That had been the precise holding in *Matule, supra,* which cited authority for the concept that while extortion " 'in a comprehensive sense, signifies any *oppression* under color of right', yet 'in the strict sense it signifies the unlawful taking by any officer, by color of his office, of any money or thing of value that is not due to him, or more than is due, or before it is due.' " (emphasis added). 54 *N. J. Super.* at 331. The court further found *State v. Weleck,* 10 *N. J.* 355 (1952), to be supportive of the position that the taking of money need not be "coercive" to found criminal liability. 54 *N. J. Super.* at 331.

We approve the holding in *Matule* as entirely sound; under it the defendant's contention that culpability requires a prior demand by the defendant must be rejected. We disapprove the passing allusion in *State v. Seaman,* 114 *N. J. Super.* 19, 31 (App. Div.), certif. den. 58 *N. J.* 594 (1971), *cert.* den. 404 *U. S.* 1015, 92 S. Ct. 674, 30 L. Ed. 2d 662 (1972), to a requirement of *"demanding"* (emphasis in the original) an illegal fee as an element of the crime of extortion. This is not the law of this State.

## II

As noted above, during the course of defendant's exceptions to the court's charge with respect to the element that the money must have been received by color of the official's office, counsel attempted, but not as clearly as would have been desirable, to contend that the statute intends that the money must have been given and taken for the performance by the officer of his duties — *i. e.* in return for such performance. In effect, the position was that if the giving and taking of the money was a pure gift, whatever the donor's originating motivation, and not understood as compensation for the performance by the officer of his duties, there could be no culpability under this particular statute. Study of the background of the act and of the pertinent authorities satisfies us that the defendant was correct in this regard and that the failure of the trial court so to charge, whether in terms of the definition of receiving "by color of office" or of the intent of the other language of the act, visited a manifest injustice on the defendant requiring a reversal.

Although our route in reaching the foregoing conclusion was not that taken by defendant at trial, the point he made was sufficiently germane to it in substance to justify our considering it under the "plain error" doctrine.

█ A glance at the text of the statute reveals a patent ambiguity. Does the phrase, "for performing his duties", modify the language, "receives or takes any fee or reward",

or does it modify the language, "not allowed by law"?. It sensibly can take either or both constructions in the light of the apparent purpose of the act. Most of the cases appear not to have been concerned with this problem, and have used the words, "for performing his duties", ambivalently. See *State v. Begyn, supra* (34 *N. J.* at 46, 47) ; *State v. Seidman,* 107 *N. J. L.* 204 (Sup. Ct.) aff'd sub nom. *State v. Fischman,* 108 *N. J. L.* 550 (E. & A. 1931). But a study of the statutory antecedents of the present statute leaves no fair doubt that it was the original legislative intent that the phrase, "for performing his duties", modified or qualified the subject of receiving or taking the fee or reward. That is to say, the receipt or taking of the money must have been in return for the performance of official duties in order to posit culpability.

The 1796 statute (*L.* 1796, p. 98, *Paterson, Laws* (1800), p. 212) ordained that

> no judge, justice * * * or other officer of this State * * * shall *receive or take any fee or reward to execute and do his duty and office,* but such as is or shall be allowed by the laws of the State; and further, that if any such judge, justice, * * * or other officer as aforesaid shall receive or take, by colour of his office, any fee or reward whatsoever not allowed by the laws of this State for doing his office, and be therefor convicted, he shall be punished by fine or imprisonment, or both * * * (emphasis added).

The context clearly shows that the prohibited receiving or taking was that for the execution and doing of the officer's duty and office. The intent was rendered even clearer in the revised act of 1829, (§ XXV, p. 115) (Elmer's Digest, Laws of New Jersey, § XXV, p. 106, (1838)), where commas were inserted after the words "whatsoever" and "State" in the portion of the act defining the crime. By the revision of 1898, *c.* 235, § 22, p. 800 (2 C. S. 1910, § 22, p. 1750), the statute was shortened, the hortatory direction at the beginning eliminated and the clarifying punctuation also eliminated. But no assumption can be indulged that the change in punctuation was intended to affect substance. Further revisions,

obviously for style only, were effected in the Revised Statutes of 1937 (*R. S.* 2 :127–1) and the Revision of Title 2 in 1952 (the present statute).

In *State v. Barts,* 132 *N. J. L.* 74 (Sup. Ct. 1944), aff'd o. b. 132 *N. J. L.* 420 (E. & A. 1945), the court sustained a conviction under the act of a police officer who had demanded money *not* to arrest a person who had committed larceny, as against the contention that the statute penalized the taking of money only for performing, and not for *not* performing, the officer's duty. The position was summarily rejected, without analysis, on the alternative construction of "for performing his duties" mentioned above, *i. e.* the official had received a reward "not allowed by law for doing his office." (132 *N. J. L.* at 90). The holding in *Barts* was accepted by this Court by *dictum* in *State v. Begyn, supra,* as extending the prohibition of the statute to the receipt by an officer, by color of his office, of a reward "to which he is not legally entitled by reason of or in connection with his official duties." (34 *N. J.* at 47). It was thought, in other words, that any taking of money not due in connection with official duties comes within the purview of the statute if taken by color of office.

We need not here pass upon the correctness of the *result* in *Barts.* But we are constrained to disagree with any implication which might be sought to be drawn from the reasoning in that opinion that liability under the act does not require that the receipt or taking by the officer must be shown to have been *for* the performance of his duties. We are clear that it is so required where the acts relied upon by the State represent performance rather than non-performance of duties. A similar construction of the corresponding Pennsylvania statute is found in *Commonwealth v. Hopkins,* 165 *Pa. Super.* 561, 69 *A.* 2d 428, 431 (Super. Ct. 1949).

The same effect of the construction of the act we have advanced above may be alternatively achieved by acceptance of the rationale for "by color of his office," set forth by Chief Justice Vanderbilt in *State v. Weleck, supra,* (10 *N. J.* at

372), where that phrase was defined as meaning "simply that the officer must have taken money not due him for the performance of his official duties". That the phrase, "for the performance of his official duties," in the excerpt quoted was meant to qualify the words, "must have taken money," rather than, "money not due him," is manifested by the next sentence: "There is no requirement that the taking precede the performance of the duties * * *". The *Weleck* court's view of the matter is probably too narrow. If the statute, taken independently of "by color of his office," requires that the taking of the fee have been for the performance of the duties of the office, as concluded earlier in this Point, it would render "by color of his office" surplusage to construe it as simply meaning the same thing.

█ The most authoritative definition of "by color of his office" appears to be that set forth in 1 *Burdick, Law of Crime* (1949) § 275, p. 395, and quoted in *State v. Weleck, supra* (10 *N. J.* at 372). This requires that the service rendered "must be apparently, or pretended to be, within official power or authority, and the money must be taken in such apparent or claimed authority". The rendition by a public officer of a service in his private capacity, for which he receives or demands payment, is not technically extortion because not made under color of office. 3 *Wharton, Criminal Law and Procedure* (1957), § 1393, p. 790–791. This distinction has been the basis for frequent exculpation of this offense. *Collier v. State,* 55 *Ala.* 125 (Sup. Ct. 1876); *United States v. Sutter,* 160 *F.* 2d 754, 756 (7 Cir. 1947); *Commonwealth v. Francis,* 201 *Pa. Super.* 313, 191 *A.* 2d 884, 889 (Super. Ct. 1963), *cert.* den. 375 *U. S.* 985, 84 S. Ct. 517, 11 L. Ed. 2d 472 (1964).

█ In the context of facts like those at bar, where no possible argument could have been made by defendant that the rendition of his inspection duties was in a private or non-official capacity, probably no harm would have been visited

on him by the short-cut definition of "by color of office", in the charge below, as *"in connection with* the performance of his official duties," if the judge had also charged that the money must be shown to have been received in return for the performance of those duties. The charge as given did not inform the jury that the money received had to have been understood as a *quid pro quo* for the performance of the services, but merely "in connection with" such performance — a criterion distinctly different from the statutory element of culpability. The jury here could very well have convicted defendant on the court's charge without believing the money was paid and received in return for defendant's performance of his duties, and even crediting defendant's contention that it was a pure gift — on the theory that the friendship that motivated the gift was "connected" with the association growing out of the building project inspected by defendant. It was vital for the jury to have had in mind the correct conception of the law since we believe that the evidence permitted either a conviction or an acquittal under the authoritative construction of the statute set forth above.

We recognize that our construction of *N. J. S. A.* 2A:105-1 may enable some public officials who have accepted "gifts" not due them from persons who stand to benefit from the performance of their official duties to escape conviction under that statute (but *cf. N. J. S. A.* 2A:85-1 (Misconduct in office)). But we of course do not by this opinion in any way approve such conduct. The result we reach here is mandated by the statute and does not reflect our own views as to sound public policy or morality. *Cf. State v. Cohen,* 32 *N. J.* 1, 10-15 (1960) (Weintraub, C. J., concurrring).

In the light of these conclusions there must be a reversal of the conviction and a retrial. Since at such retrial the question of the mental element involved in this type of crime will arise anew, we now turn to the argument made by defendant in connection with that issue.

### III

The disagreement between the judges in the Appellate Division as to the requisite mental element for culpability of this offense is illustrative of the confusion that has attended the concept of *mens rea* in criminal law over the centuries both in England and in this country. It will be remembered that the charge to the jury below made no reference to criminal intent at all. This we think was wrong, but the refusal to charge the defendant's requests as to intent was probably not prejudicial in the light of the evidence.

■ ■ The trial judge was undoubtedly influenced by the statement in *State v. Begyn, supra,* that "[t]he proof of receipt of a knowingly unlawful payment in connection with his duties is enough *and furnishes the necessary criminal intent"* (emphasis added). 34 *N. J.* at 47. However, that statement is not an endorsement of the failure of a judge in an extortion case to instruct the jury that to convict they must find beyond a reasonable doubt (a) that defendant intended to take the money he received; and (b) if he offers the defense of reasonably believing the money was due him, and comes forward with some evidence thereof (or if such evidence is present in the State's case), that his assertion is not true. Here, however, as the State contends, defendant made no contest as to his intent to take the money (he hardly could have, on the fact-showing at the trial) or as to his knowledge that the money was not a fee due him for his work.[1] There was thus no prejudice in the omission of a charge of intent as to these elements.

Thus, defendant can establish reversible error on this phase of the case only if he is right in his contention that the trial judge was obliged to charge the substance of his

---

[1]Under our holding in II, *supra*, however, it was incumbent that the jury be charged that defendant must have understood that the money was being tendered him in return for past or future performance of the duties of his office.

request to charge that criminal liability "connotes an intentional violation of the law" and that "a defendant who actually does violate the law would not be guilty of the criminal offense alleged unless he is either conscious of the fact that what he is doing constitutes a violation of the law" or acts in total disregard of the law without any reasonable effort to determine whether his conduct violates the law.

The development of defendant's argument in his brief makes it evident that what he meant by the foregoing requests is that he must be shown to have been conscious of wrongdoing when he took the money in question; that nothing short of such a state of mind satisfies the asserted common-law requirement of a *mens rea* or evil mind or intent; and that *N. J. S. A.* 2A:105-1, being a codification of a common-law crime, must have that mental element read into it unless the Legislature plainly manifested its intention that an evil mind or intent was not required. He asserts that the Legislature did not so signify as to this enactment. *Cutter ads. State, 36 N. J. L.* 125 (Sup. Ct. 1873), is cited to support the contention advanced.

The language of Request to Charge No. 15 suggests that it was defendant's position at trial that he could not be found to have been conscious of wrongdoing if he was not conscious of the fact that what he was doing was a crime and if he was not totally disregarding the law and failing reasonably to investigate the law in respect of the subject in question. It is well to note at this point that defendant did not testify that he was unaware of the existence of a criminal statute like the one here involved or that he was of the impression that public officers could properly accept in return for performance of their duties, and by color of their office, money not due them for such performance. Moreover, for purposes of this disposition, we need not consider whether the facts of this case warranted a jury charge on reckless or negligent failure to make inquiry as to such a criminal statute. *Cf.* A. L. I., Model Penal Code, Proposed

Official Draft (1962) Sec. 2.04(3); *Lambert v. California,* 355 *U. S.* 225, 78 S. Ct. 240, 2 L. Ed. 2d 228 (1957); *State v. Hatch,* 64 *N. J.* 179, 184 (1973); *State v. De Meo,* 20 *N. J.* 1, 14 (1955).

The lead majority opinion in the Appellate Division held that the statute was not properly construable to require application of "a subjective test of consciousness of guilt," as urged by defendant. 128 *N. J. Super.* at 339. The judge held that "the necessary intent may be spelled out from receipt of the money, a fact which defendant readily admitted * * *"; *id.* at 338. The trial judge's refusal "to charge in general terms on the subject of criminal intent" was found not to present error; *id.* at 340. The concurring majority judge, coming closest to the mark, conceived the "problem rightly to be not whether criminal intent must be shown, but rather what the nature of the intent must be * * *"; *id.* at 340. He regarded *Begyn, supra,* as demonstrating that "all the intent necessary is present upon receipt of a payment, provided only that the official knows the payment to be unlawful"; *id.* at 341. The dissenting judge, equating "criminal intent" with "corrupt intent", *id.* at 342, found that a showing of such corrupt intent was declared essential for culpability in *Cutter ads. State, supra,* and that that case settled the question in the absence of intervening legislative modification of the statute.

A

Any rational approach to the specific issues presented requires recognition at the outset that the term *mens rea* is an undifferentiated lump-concept which has been loosely used by law writers and judges to embrace a number of different and distinct legally significant states of mind of an accused. Professor Sayre has cogently observed that for clarity of analysis "[t]he old conception of *mens rea* must be discarded and in its place must be substituted the new concept of *mentes* [plural] *rea.*" Sayre, "Mens Rea", 45

*Harv. L. Rev.* 974, 1026 (1932); and see Hall, General Principles of Criminal Law, 103 (1960).

Thus, such states of mind include the ordinary intent or conscious volition to do the act forbidden (or to omit the act commanded); the awareness of all the circumstances material to the offense, or, put otherwise, absence of reasonable mistake as to fact or as to a legal relationship if made an element of the offense; absence of incapacity, actual or constructive, to form an intent or to understand the circumstances material to the offense such as insanity and infancy, or to act voluntarily, as in duress (at common law and some states). They also include such "specific intents" as premeditation in murder, intent to defraud as in obtaining money under false pretenses, receiving stolen goods knowing them to have been stolen and many others, usually specified in criminal statutes. Decisions exculpating defendants under the purported broad rubric of absence of *mens rea,* evil mind or consciousness of wrongdoing have almost invariably been based on the lack of one or another of the particular incriminatory states of mind enumerated above. See, *e. g. Morissette v. United States,* 342 *U. S.* 246, 273–274, 72 S. Ct. 240, 96 L. Ed. 288 (1952), actually decided on the basis of mistake of fact as to a circumstance material to the offense; *Cutter ads. State, supra,* of which more anon, actually resting on reasonable mistake as to a legal relationship the existence of which was made a constituent element of the offense by the statute (a predecessor of that here involved.)[2]

---

[2]Professor Mueller, by contrast, argues for the existence at common law of a unifying concept of *mens rea* that would in all cases exculpate the morally blameless. Mueller, "On Common Law Mens Rea", 42 *Minn. L. Rev.* 1043, *passim* (1958). He suggests "[a]bsolute criminal liability is beginning to end in America", *id.* at 1104, and that any statutes "attempting to abolish a universal *mens rea* requirement * * * are unconstitutional". *Ibid.* We do not share these latter views. (con't. p. 456)

Small wonder that a scholar, writing on this subject, could open his article: "A tradition of chronic imprecision in the elucidation of principles of criminal responsibility has existed in the common-law world for more than seven centuries". Dubin, "Mens Rea Reconsidered, etc.", 18 *Stan. L. Rev.* 322, 324 (1966); or that the reporter for the Model Penal Code, in his comments on Sec. 2.01 (General Requirements of Culpability) should say: "This section attempts the extremely difficult task of articulating the general *mens rea* requirements for the establishment of liability." (p. 122).

It has been authoritatively observed that the general concept of *mens rea* in its classic sense of evil mind may have developed, at least in part, because all the common-law felonies involved conduct morally reprehensible to the community as well as patently intentional. Sayre, *op. cit. supra,* 45 *Harv. L. Rev.* at 988–989; *cf.* Mueller, *op. cit. supra* (42 *Minn. L. Rev.* at 1058, 1101). Thus, it was natural, although analytically incorrect, for writers and judges developing such defenses as infancy, insanity or compulsion, to rationalize them on the absence of *mens rea,* rather than, more appropriately, upon mental incapacity for voluntary action. Sayre, *op. cit. supra,* at 989. In other words, it was not that the defendant's mind was not evil, but rather that he had no mind that was free to will.

We do share the view that the criminal law should tend to exculpate the morally blameless, see *State v. Hudson County News Co.,* 35 *N. J.* 284, 290–293 (1961). However, if absolute liability means liability without regard to knowledge or consciousness of all the attendant facts and circumstances material to the offense, the Model Penal Code (see infra, n. 3) would prohibit such incrimination unless a statute plainly dictates that result. Many of the decisions inveighing against strict or absolute liability, and incanting *mens rea,* could be rationalized on absence of consciousness (mistake of fact) of material attendant facts.

However, the pressure of social value-judgments may properly dictate penal statutes which are truly absolute in that they disregard the lack of knowledge by the accused of material attendant circumstances. Thus, in statutory rape good-faith belief by defendant that the female is over age is no defense. *State v. Moore,* 105 *N. J. Super.* 567 (App. Div.), certif. den. 54 *N. J.* 502 (1969).

■ Leading British and American writers and judges in the modern era have fairly uniformly eschewed positing criminal liability on a guilty or evil mind but have rather conceived the "mental element" of criminality as "either intention to do the act or bring out the consequence or (in some crimes) recklessness as to that consequence", Glanville Williams, "Criminal Law" 28–29 (1953); or, as more comprehensively stated: *"Mens rea* consists of two elements. It consists first of all of the intent to do an act and secondly of the knowledge of the circumstances that makes that act a criminal offense". Devlin, Statutory Offenses, 4 *J. of Soc. Pub. Teachers of L.* 213 (1958), as quoted in Hall, *op. cit. supra,* p. 71; and see *ibid., passim* pp. 70–77. Knowledge of the criminal law, however, is ordinarily no part of the circumstances as to which the accused is required to have awareness to be culpable. Glanville Williams, *op. cit. supra* at 384–387.

Some of the best thinking in the American legal community was brought to bear on the subject in the formulation of the Model Penal Code (Proposed Official Draft 1962) (*op. cit. supra*) by the American Law Institute. The provisions thereof which directly concern us are found in Sections 2.01, 2.02 and 2.04 thereof. Putting to one side the subjects of absolute or strict criminal liability and criminality based on recklessness and negligence, none of which are here involved, the relevant provisions are set forth in the footnote[3] and may be summarized as follows. Cul-

---

[3]Section 2.01. Requirement of Voluntary Act; Omission as Basis of Liability; Possession as an Act.

(1) A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the omission to perform an act of which he is physically capable. * * *

Section 2.02. General Requirements of Culpability.

(1) *Minimum Requirements of Culpability.* Except as provided in Section 2.05, a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense.

pability, absent specific legislation otherwise, requires purposeful and knowing action as to each element. If the element involves the attendant circumstances, there must be awareness of the circumstances. Ignorance as to whether the conduct constitutes an offense or as to the meaning or application of the law determining the offense is no excuse unless

(2) *Kinds of Culpability Defined.*

(a) *Purposely.*

A person acts purposely with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(b) *Knowingly.*

A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such cricumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is pratically certain that his conduct will cause such a result. * * *

(3) *Culpability Required Unless Otherwise Provided.* When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts purposely, knowingly or recklessly with respect thereto. * * *

(8) *Requirement of Wilfulness Satisfied by Acting Knowingly.* A requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements appears.

(9) *Culpability as to Illegality of Conduct.* Neither knowledge nor recklessness or negligence as to whether conduct constitutes an offense or as to the existence, meaning or application of the law determining the elements of an offense is an element of such offense, unless the definition of the offense or the Code so provides. * * *

Section 2.04. Ignorance or Mistake.

(1) Ignorance or mistake as to a matter of fact or law is a defense if:

(a) the ignorance or mistake negatives the purpose, knowledge, belief, recklessness or negligence required to establish a material element of the offense; or

(b) the law provides that the state of mind established by such ignorance or mistake constitutes a defense. * * *

the definition of the offense so prescribes. It is apparent from the formulation that consciousness of wrongdoing or intention to commit a crime (as distinguished from intention to do the acts legally constituting the crime) is not relevant to the formulation.

The reporter's Comment states that the purpose of articulating in detail the distinctions made in the Code is "to promote the clarity of definitions of specific crimes and to dispel the obscurity with which the culpability requirement is often treated when such concepts as 'general criminal intent', 'mens rea', 'presumed intent', 'malice', 'wilfullness', 'scienter' and the like must be employed." Comments, § 2.02, p. 124.[4]

A largely parallel approach to the problem has been taken by the New Jersey Penal Code proposed by the New Jersey Criminal Law Revision Commission (1971) which, as amended (there are no amendments as to the general culpability provisions), was introduced in the current Legislature as Assembly Bill, No. 3282. See Secs. 2C:2–2, 2C:2–4, Vol. 1, pp. 14–17. Sec. 2C:2–2d adopts the language of Model Penal Code 2.02 (id. at 16) that:

> d. *Culpability as to Illegality of Conduct.* Neither knowledge nor recklessness nor negligence as to whether conduct constitutes an offense or as to the existence, meaning or application of the law determining the elements of an offense is an element of such offense, unless the definition of the offense or the Code so provides.[5]

---

[4]Compare Judge Kolovsky's comment in *State v. Lambertson*, 110 *N. J. Super.* 137, 142 (App. Div.) certif. den. 56 *N. J.* 479 (1970) : "The cases use many words, criminal intent, corrupt intent, corruption, bad faith and the like."

[5]The proposed New Jersey Code adds the salutary requirement that a statute not expressly designating "a culpable mental state" [as defined] should be construed to require it "if the proscribed conduct necessarily involves such culpable mental state." Strict liability is not to be inferred unless the statute clearly evinces such intent. Sec. 2C:2–2c.(3). Vol. 1, p. 16.

The principles of mental culpability embodied in the Model Penal Code and the proposed New Jersey Penal Code were substantially anticipated and declared by this Court as the law of this State in *Morss v. Forbes,* 24 *N. J.* 341 (1957). The case was not a criminal prosecution but an inquiry into the power of a legislative committee to investigate wiretapping activities of the Union County Prosecutor's Office. A subordinate inquiry was raised as to whether those activities violated the then statutory penalization of "willful and malicious" interception of telephonic communications. *N. J. S. A.* 2A:146–1 (since repealed; *L.* 1968, *c.* 409, § 27). The prosecutor contended his conduct was not willful or malicious, but in the public interest, and intended to secure efficient enforcement of the law. The Court pointed out that it was important not to confuse motive, which is not essential to guilt but only evidentiary on that question, with intent. 24 *N. J.* at 359. The laudatory qualities of an act prohibited by the Legislature would not absolve the actor from criminal sanctions. It was then stated (*Ibid*):

> The ordained inquiry is whether the act condemned was committed with full knowledge of the facts, in a conscious and purposeful manner, without legal justification or excuse. It must not be the product of inadvertence or negligence or any state of mind other than a free and untrammeled will. This is the definition of criminal intent embodied in the words "willfully and maliciously," as used in this statute. The accused must intend to act in the way proscribed by the statute, but *it is immaterial that he does not know or believe his conduct violates the law.*
>
> Even positive belief that the act is lawful should not exempt the doer from criminal responsibility. *Consciousness of unlawfulness is not essential.* 1 *Wharton, supra, at* § 160. If ignorance were a good defense, the administration of the penal law would again depend upon the well-nigh impossible ascertainment of hazy and amorphous mental conditions and opaque logic. (emphasis added).

The Appellate Division has recently applied these principles, specifically rejecting the proposition that consciousness of guilt or wrongdoing was an element of the offense, both in *State v. Lambertson, supra* (involving *N. J. S. A.* 2A:135–

8(c))⁶ and *State v. Hanly,* 127 *N. J. Super.* 436 (App. Div.), certif. den. 65 *N. J.* 578 (1974) (involving *N. J. S. A.* 2A:135-3 (a public officer willfully obtaining or assisting in obtaining from a public body for any person a thing of value not lawfully due such person).

We are aware of no decision in this State holding that a trial court erred in not charging a jury that they must find the defendant to have been conscious of wrongdoing or guilt when he committed the incriminating act or to have intended to violate the criminal law (as distinguished from having intended, with knowledge of all material attendant circumstances, to do the act proscribed). Absent a statute clearly specifying such mental states as a predicate of guilt, they are not required. See *Halsted v. State,* 41 *N. J. L.* 552, 596 (E. & A. 1879).⁷

---

⁶The statute in *Lambertson* presents a troublesome problem. It declares guilty of a misdemeanor a member of a governing body who, among other things, "is directly or indirectly concerned" in a contract for construction of an improvement by the body or "is directly or indirectly interested" in furnishing goods to and at the expense of the body. A minority stockholder in a corporation which had sold goods to the county which he served as a member of the board of freeholders was indicted. He had not participated in the sale or purchase but only in approving an expense voucher for payment of the bill. The Appellate Division held no corrupt motive was required to be shown by the State but merely simple intent, according to the *Morss v. Forbes* formulation, notwithstanding that *State v. Kuehnle,* 85 *N. J. L.* 220, 224 (E. & A. 1913), construing the same statute, held that the defendants' "concern", in the statutory phrase, must be shown "not merely * * * selfish and pecuniary, but corrupt".

The difficulty is with the statute, which does not penalize an act or an omission but a status (concern or interest) regardless of whether or not the defendant participates in the creation of that status. Unless some such qualification as that in *Kuehnle* is to be implied, the statute may possibly be so unreasonable as to be invalid. *Cf. Robinson v. California,* 370 *U. S.* 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962).

⁷A qualification must be conceded as to the common-law crime of misconduct in office. There is considerable confusion in our cases as to whether "corruption", or "bad faith" must be established. See *State v. Weleck,* 10 *N. J.* 355 (1952) ; *State v. Winne,* 12 *N. J.* 152

Defendant relies on *Cutter ads. State, supra* (36 *N. J. L.* 125), which involved an early antecedent of the statute before us. Despite quite unnecessary language in the opinion concerning an "evil mind" being "at the root of criminal law", *id.* at 126, and as to the presumption "that the law makers did not intend to disgrace or to punish a person who should do an act under the belief that it was lawful to do it", *ibid.,* the actual holding of the case was that defendant, a magistrate, had a right to interpose as a defense his reasonably entertained belief that he was entitled by law to the fees he received. The statute prohibited only the taking of fees "not allowed by the laws of the State". The court found that there was a generally prevailing opinion that such fees as the defendant took could legally be taken. 36 *N. J. L.* at 128. The court properly characterized the defense as one of honest "mistake" by defendant as to what was due him; *id.* at 129. Only in that sense can the expression that the defendant "was not conscious of doing anything wrong", *id.* at 128, be regarded as an appropriate rationale for the result.

The *Cutter* decision illustrates the principle that while knowledge of the criminal law is not a requisite element of an offense, yet reasonable ignorance or mistake as to a legal relationship made an element of the offense by the statute involved, as in *Cutter* and here, will ordinarily negate the required mental culpability. Commentary, II Proposed New Jersey Penal Code, *op. cit. supra,* pp. 47–48; and see Glanville Williams, *op. cit. supra,* at 135 *et seq.* But see *State v. De Meo, supra* (20 *N. J.* at 14) (impression of

---

(1953); *State v. Williamson,* 31 *N. J.* 16, 22 (Weintraub, C. J., concurring) (1959), aff'g. o.b. the opinion of the Appellate Division in 54 *N. J. Super.* 170, 184–185. See also the Proposed New Jersey Penal Code, *op. cit. supra,* Sec. 2C:30–2, Vol. I, p. 109, which, in respect of official misconduct, states as an element of the offense the "purpose to act unlawfully". See Commentary thereon, Vol. II, *op. cit.,* 291–292.

validity of mail-order Mexican divorce will not constitute defense to bigamy).[8]

*State v. Hanly, supra,* also recognizes that where a statute proscribes a taking or payment of public funds for one to whom they are not due, reasonable lack of knowledge by the defendant that the moneys were not due is a defense. But the court there held that the failure of the trial court so to charge in that case was harmless error. 127 *N. J. Super.* at 445.

Our discussion of *Cutter ads. State, supra,* is dispositive also of *Loftus v. State,* 52 *N. J. L.* 223 (E. & A. 1890) (opinion printed only in 19 A. 184), similarly relied upon by defendant. *Loftus* purported to follow *Cutter,* but misread that decision to require that the taking by the officer be with corrupt motive (19 *A.* at 184).

Finally, defendant can take no comfort from the reference in the *Begyn* opinion *supra,* to the purpose of the statute as being "to penalize the officer who *non-innocently* insisted on * * * a fee where none was permitted or required to be paid * * *" (34 *N. J.* at 46), and the additional statement that "[t]he proof of receipt of a *knowingly* unlawful payment * * * furnishes the necessary criminal intent." *Id.* at 47 (emphasis added in both instances). Non-innocence was intended to refer to an officer who knew the fee was not due him and had taken it by color of his office. A "knowingly

---

[8]Defendant's freedom from mistake of fact or as to fact-law should not be part of the State's affirmative case, the proof of such mistake being peculiarly within the possession of the defense. If mistake is raised as a defense, it is defendant's burden to come forward with some evidence thereof, unless present in the State's case, with the ultimate burden of persuasion beyond a reasonable doubt resting on the State. *Cf. State v. Chiarello,* 69 *N. J. Super.* 479, 498–502 (App. Div. 1961), certif. den. 36 *N. J.* 301 (1962).

*Chiarello* exemplifies the rule that defendant's reasonable mistake of fact will sustain the defense of justification, 69 *N. J. Super.* at 484–494, although the court's language is typically couched in *mens rea* terminology. *Id.* at 487, 488–490.

unlawful" payment obviously connotes one the officer had no reason to believe was due him.

For the reasons set forth above there was no error in the court's refusal to charge the specific requests of the defendant under discussion. However, we would expect that at the retrial the court will charge the elements of mental culpability applicable to this offense, as outlined above, and leave their determination to the jury, without regard to the judge's own view of the evidence as to such elements. See *Morissette v. United States, supra* (342 *U. S.* at 274, 72 S. Ct. 240) ; *People v. Flack, 125 N. Y.* 324, 26 N. E. 267 (Ct. Ap. 1891).

Judgment reversed; cause remanded for a new trial.

SULLIVAN, J. (dissenting). I feel that the trial court's charge was adequate and correct in the circumstances of this case and that the judgment of conviction should be affirmed.

Defendant was the municipal building inspector charged with enforcing the local building code. As the majority opinion notes, his duties included on-site inspection of buildings under construction for code compliance, and issuance of certificates of occupancy. At the time, U. S. Home and Development Corporation was in the process of constructing a large housing development in the township. Defendant made numerous on-site inspections of the work in the development as it progressed and also made final inspections prior to issuing certificates of occupancy. He estimated that 65 to 70 percent of his time as building inspector was devoted to servicing this particular development. In December 1970, while defendant was on the development site, he was handed an envelope containing a substantial sum of money by an officer of the development corporation who wished defendant a Merry Christmas or words to that effect. On the basis of the foregoing, defendant was charged with and convicted of violating *N. J. S. A.* 2A:105–1 which makes it a misdemeanor

for a public officer, by color of his office, to receive or take any fee or reward not allowed by law for performing his duties.

The majority opinion reverses this conviction on the ground that if the giving and taking of the money was a "pure gift" and not understood as compensation for the performance by the officer of his duties, there was no culpability under the statute, and the jury should have been so charged. I find this distinction to be unrealistic. Indeed, defendant testified he believed the money had been given to him "because of the good service [he had] rendered to U. S. Homes."

A public official should not accept a gift of substance from anyone he must deal with in his official capacity. Calling it a Christmas gift does not make it right. Whether the official realizes it or not, the acceptance of such a gift has a subtle corrupting effect on him and the manner in which he carries out the duties of his office insofar as the donor's interests are involved. The image of governmental integrity becomes badly tarnished when this kind of practice is condoned.

The majority opinion recognizes that its construction of the statute may enable some public officials who have violated the statute to escape conviction thereunder. Unfortunately it is more than that. The majority opinion holds that, insofar as this statute is concerned, it is lawful for a public officer to receive or take a fee or reward from one who must deal with him in his official capacity so long as the fee or reward is a "pure gift." To me this construction does violence to the plain meaning of the statute and seems to give sanction to the odious practice of a public officer accepting "gifts" (here a substantial sum of money) from persons who stand to benefit or lose from the way in which the public officer performs his duties. I would affirm.

HUGHES, C. J. concurring in the result.

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*For affirmance*—Justice SULLIVAN—1.